[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11526

_____

D.C. Docket No. 3:12-cv-00219-JRK

ESSEX INSURANCE Company,
a.s.o. Nationwide Imaging Services, Inc.,
NATIONWIDE IMAGING SERVICES, INC.,

Plaintiffs-Appellees,

versus

BARRETT MOVING & STORAGE, INC.,
LANDSTAR TRANSPORTATION LOGISTICS, INC.,
d.b.a. Landstar Carrier,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 21, 2018)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and REEVES,[*] District
Judge.

TJOFLAT, Circuit Judge:

_____
[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

This case involves a magnetic resonance imaging machine ("MRI") that was irreparably damaged during transportation from Illinois to Texas. The MRI's components were divided into two separate shipments. The machine's owner, Nationwide Imaging Services, Inc., coordinated its transportation with one company, Barrett Moving & Storage, Inc., which transported one of the shipments with its own truck and arranged for a third party, Landstar Transportation Logistics, Inc., to transport the other shipment. The components shipped on the Landstar truck were damaged in transit, while the components shipped on the Barrett truck arrived intact. The damage to the components on the Landstar truck rendered the entire MRI inoperable.

Nationwide and its insurer, Essex Insurance Company, brought suit against both transportation companies to recover for the loss of the MRI under the Carmack Amendment, 49 U.S.C. § 14706 *et seq.*, which makes motor carriers in interstate commerce strictly liable to shippers for the actual loss of goods damaged in transit, unless a shipper and motor carrier agree to a limitation on the carrier's liability. The parties consented to a bench trial by a magistrate judge, but instead of trying the case, the Magistrate Judge opted to dispose of the controversy by granting summary judgment for Nationwide and Essex against both transportation companies. The transportation companies now appeal the grants of summary judgment against them.

2

After careful review of the record and with the benefit of oral argument, we reverse the grants of summary judgment against both Barrett and Landstar.

I.

A.

In November 2010, Nationwide, a company that buys and sells used medical equipment, contacted Barrett to obtain a quote for the shipment of an MRI Nationwide owned from Park Ridge, Illinois to Dallas, Texas. Ann Marie McGuigan, an employee of Nationwide, emailed Stacey Jacobson, an employee of Barrett, to obtain the quote. McGuigan told Jacobson that the MRI would have to be shipped in two pieces: the MRI's magnet had to be shipped on a flatbed truck while the machine's electronics needed to be shipped in an enclosed trailer. McGuigan also stated that both shipments had to arrive at the site in Dallas at the same time. Jacobson responded to McGuigan's email with a quote for the shipment: $2,236 for the flatbed truck and $3,860 for the enclosed trailer.

Thereafter, the parties exchanged a series of emails to work out the logistics of the shipment and the specific dates and times of the MRI's pickup and delivery, settling on a shipment date of December 2. On December 1, Nationwide placed the shipment on hold until further notice due to scheduling changes. On December 10, the parties resumed discussion over the dates and times of pickup and delivery, settling on a new pickup date of December 16 and delivery date of December 18.

3

Due to the quick turnaround time between pickup and delivery Nationwide requested, Jacobson told McGuigan that she would need to book a team of drivers for the flatbed, as opposed to a single driver, to ensure that no single flatbed driver would exceed the number of consecutive driving hours without a break allowable under federal regulations. Jacobson stated that a team would cost $3,375 and that she would need to check the availability of a team that could accommodate the desired schedule. McGuigan authorized Jacobson to proceed with scheduling the shipment and reiterated that Nationwide needed the shipment to be delivered at noon on Saturday, December 18. Jacobson responded to confirm and said she had "notified my logistics to begin searching [for] a flatbed team."

During this exchange, Jacobson sent McGuigan emails with the names of the drivers for both the flatbed truck and the enclosed trailer. In one of those emails, Jacobson referred to the driver of the enclosed trailer, Jerry Armson, as a "Barrett driver." In a subsequent email, Jacobson gave McGuigan the names of the flatbed team drivers, Jeff and Rebecca Waldorf. In that message, Jacobson did not state whether the Waldorfs were "Barrett drivers" or drivers for another company. In another email, Jacobson provided a phone number for an "emergency contact at Barrett" who would be available during the weekend shipment. The contact, Brigitt Berlin, was a Barrett employee.

4

On the day of the scheduled pickup, the flatbed truck and the enclosed trailer arrived at the site in Park Ridge as planned. The enclosed trailer that arrived was owned by Barrett and driven by Armson, a Barrett driver, but the flatbed was owned by Landstar and driven by a team of Landstar drivers. Also present at the pickup site was Mark Depew. Nationwide hired Depew, an "independent engineer," to oversee the "loading, packing, and unloading of the [MRI] equipment." Larry Knight, an associate of Depew, was also present and observed the loading and unloading of the MRI. Knight testified he inspected the MRI and found it "in excellent condition," and the packaging and loading of the machine onto the trucks went without incident. Depew agreed.

The Landstar drivers presented Depew with a "Uniform Straight Bill of Lading," which Depew signed.[1] Depew was the only signer; the record does not suggest that a Nationwide employee or any other person received or signed the bill of lading at that time. Thereafter, the drivers departed with the MRI. As planned, the magnet traveled on the flatbed trailer while the electronic components traveled inside the enclosed trailer.

While the MRI was in transit, Depew and Knight traveled to Dallas on their own so that they would be present when the shipment arrived at the delivery site.

---

[1] The section of the bill of lading Depew signed was titled "Shipper Certification." The text above where Depew signed stated: "This is to certify that the above named materials are properly classified, described, packaged, marked and labeled, and are in proper condition for transportation according to the applicable regulations of the Department of Transportation."

5

When the shipment arrived, Depew again signed the bill of lading.[2]  Then, the riggers removed the "tarp like covering" from the magnet and it was revealed that the magnet had "ice buildup" on its exterior surface.  Depew and Knight both stated that the Landstar drivers were unfamiliar with "MRI machinery" and "thought that the ice on the unit was there as a result of exposure to the elements during transport."  After several days of testing, Nationwide learned that the inside of the magnet was severely damaged: all of the helium inside the magnet had leaked out, which caused the ice buildup witnessed by the team at the delivery site.  The experts who tested the magnet determined that "the unit suffered a severe shock during transportation from Chicago to Dallas which resulted in a thermal short to the magnet," hence the helium leakage and the ice buildup.  The damage to the magnet resulted in a total loss of the MRI unit.

Nationwide paid $420,000 to purchase the MRI and was planning to sell it for $560,000.  As a result, Nationwide filed a claim with Essex, its insurer.  Essex paid the policy limit on the magnet, $346,500, and retained subrogation rights in the amount it paid.

## B.

In January 2011, Nationwide sent Barrett a letter informing Barrett that it intended to file a claim for the loss of the MRI.  In response, Barrett drafted a letter

---

[2] In Dallas, Depew signed the "Receiver Certification" on the same bill of lading.  That section read, "Received the above described property in good condition except as noted."

6

it sent "to all concerned parties," including Nationwide and Landstar.  In the letter, Barrett stated that it was "the transportation arranger of this shipment" and that it was sending the letter "to confirm identification of all responsible parties to facilitate the claims process."

Thereafter, Nationwide and Essex[3] brought this action in the United States District Court for the Middle District of Florida against both Barrett and Landstar. Nationwide brought its claim under the Carmack Amendment, 49 U.S.C. § 14706 *et seq*.  The Carmack Amendment, a part of the Interstate Commerce Act ("ICA"), makes all motor carriers "who receive[], deliver[], or provide[] transportation or service" during a shipment strictly liable to the shipper "for the actual loss or injury to the property," regardless of which carrier had possession of the shipment at the time it was lost or damaged.  *See id.* § 14706(a)(1).

The parties agreed to a bench trial by a magistrate judge.  After Nationwide commenced its action and the parties conducted some discovery, Nationwide moved for summary judgment against both defendants.  Nationwide argued that the undisputed evidence established as a matter of law that Barrett and Landstar were jointly liable to Nationwide under the Carmack Amendment.  Likewise, Barrett moved for summary judgment against Nationwide as to its liability for the loss of the MRI.  Barrett contended that it was a broker and not a carrier under the

---

[3] For ease of reference, we refer for the remainder of this opinion to both parties jointly as "Nationwide."

Carmack Amendment's definitions; thus, Barrett argued, it was not subject to the Amendment's strict-liability provision.

Landstar moved for partial summary judgment as to the amount of damages for which it was liable. Although it did not contest that it was subject to the strict-liability provision, Landstar argued that it could only be held liable for a portion of the damages, on account of both the liability limitation on the bill of lading and the liability limitation in an agreement Landstar previously negotiated with Barrett that applied to shipments Barrett subcontracted to Landstar.

Nationwide responded that Nationwide was completely unaware that Landstar would participate in the shipment. This was because, according to Nationwide, Barrett held itself out as the sole party assuming responsibility to ship the MRI. Thus, Nationwide argued, Barrett fell within the definition of a "motor carrier" under the Carmack Amendment's strict-liability provision. Nationwide further argued that the liability limitation between Barrett and Landstar could not limit Landstar's liability to Nationwide, because Nationwide negotiated the terms of the shipment agreement solely with Barrett and had no opportunity to agree to any limitation with Landstar.

The Magistrate Judge denied Barrett and Landstar's motions for summary judgment and granted Nationwide's motions for summary judgment against both Barrett and Landstar. He found as a matter of law that Barrett acted as a carrier

8

with regard to the shipment.  He also agreed with Nationwide that the terms of the shipment were contained solely within the chain of emails between Nationwide and Barrett; hence, the liability limitation between Barrett and Landstar was not applicable to Nationwide.  Accordingly, he held Barrett and Landstar jointly and severally liable to Nationwide and entered judgment against both companies in the amount of $560,000, the full value of the lost MRI.  Thereafter, Barrett and Landstar timely appealed.

## II.

The Magistrate Judge's grant of summary judgment in favor of Nationwide and against Barrett implicates a question of first impression in this Circuit: what is the proper test for distinguishing "brokers" from "carriers" under the Carmack Amendment?  We conclude that the Magistrate Judge applied the correct standard for distinguishing brokers from carriers but erred in finding no factual dispute over whether Barrett met that standard.

By contrast, the grant of summary judgment for Nationwide and against Landstar on the question of Landstar's limition of liability implicates well-established precedent in this Circuit.  The Magistrate Judge overlooked this precedent: as a matter of law, Landstar's agreement with Barrett met the Carmack Amendment's requirements for a valid liability limitation under the principles set forth in *Werner Enterprises, Inc. v. Westwind Maritime International, Inc.*, 554

9

F.3d 1319 (11th Cir. 2009).  Thus, the $1.00 per pound liability limitation in the bill of lading was valid, and the grant of summary judgment was in error.  We address the issues in turn.

A.

We begin with the issue of whether Barrett was a "motor carrier" with respect to the shipment of the magnet.  Barrett's liability under the Carmack Amendment's strict-liability provision turns on this determination.  If Barrett was a "motor carrier," the Carmack Amendment applies, state-law claims are preempted, and Barrett is strictly liable for the damage sustained by the magnet during transportation from Illinois to Texas.  If Barrett was a "broker," the Carmack Amendment does not apply and any claims Nationwide might have against it are beyond the four corners of this appeal.

In granting summary judgment against Barrett, the Magistrate Judge concluded that the record established conclusively that Barrett was a motor carrier, and thus that no genuine issue of material fact existed as to whether Barrett was strictly liable under the Carmack Amendment.  "We review a summary judgment ruling de novo, viewing the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion."  *Shaw v. Conn. Gen. Life Ins. Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003) (quotations and alterations omitted) (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1186 (11th Cir.1999)).  A

district court must grant a motion for summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

1.

To decide whether Barrett was a carrier, the Magistrate Judge had to first decide how to delineate carriers from brokers. "The Carmack Amendment was adopted to achieve uniformity in rules governing interstate shipments, including the rules governing injury or loss to property shipped." *UPS Supply Chain Sols., Inc. v. Megatrux Transp., Inc.*, 750 F.3d 1282, 1285 (11th Cir. 2014). Pursuant to that purpose, the Carmack Amendment preempts state-law claims against interstate motor carriers who "provide motor vehicle transportation or service subject to jurisdiction under [the Interstate Commerce Act]" and replaces those state-law claims with its strict-liability provision. *See* 49 U.S.C. § 14706(a)(1); *Smith v. United Parcel Serv.*, 296 F.3d 1244, 1246 (11th Cir. 2002) ("To accomplish the goal of uniformity, the Carmack Amendment preempts state law claims arising from failures in the transportation and delivery of goods." (citing *Adams Express Co. v. Croninger*, 226 U.S. 491, 505–06, 33 S. Ct. 148, 152 (1913))).

11

The Amendment, however, does not apply to brokers, which are purposefully distinguished from motor carriers throughout the ICA. A "broker" is defined as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2).

On the other hand, the ICA defines a "motor carrier" as "a person *providing* motor vehicle transportation for compensation." 49 U.S.C. § 13102(14) (emphasis added). Thus, the operative textual distinction between a broker and a motor carrier is whether a party *provides transportation* with regard to a given shipment, or whether it *sells*, *negotiates*, or *holds itself out* as providing transportation of that shipment.

As a purely textual matter, the line between "providing" transportation and "selling" transportation is a blurry one. So too can the line be blurry in practice. It is frequent for shipping companies like Barrett to provide transportation via their own trucks and drivers for some shipments and serve as intermediaries that link shippers like Nationwide with other carriers for other shipments, sometimes with regard to the same order. *See Megatrux*, 750 F.3d at 1289 n.7 ("A third-party logistics company may conduct multiple activities that are integrated to meet the

12

needs of its customers and the crucial inquiry is in what capacity it is acting during any particular transaction.").  Barrett's role in the shipment at issue is paradigmatic of this practice: it transported one part of the MRI assembly in its own truck driven by its own driver and arranged another part of the assembly to be picked up by Landstar's driver in Landstar's truck.

Although the question is of first impression in this Court, we are not the first authority to grapple with this distinction.  The Department of Transportation, the agency tasked with enforcing the ICA's regulatory provisions, distinguishes brokers from carriers thusly:

> Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport *and which they have accepted and legally bound themselves to transport.*

49 C.F.R. § 371.2(a) (emphasis added).  District courts in this Circuit and elsewhere have applied this definition to distinguish brokers from carriers and have observed that the key distinction is whether the disputed party accepted *legal* responsibility to transport the shipment.[4]

___

[4] *See, e.g.*, *Laing v. Cordi*, No. 2:11-CV-566-FTM-29, 2012 WL 2999700, at \*2 (M.D. Fla. July 23, 2012) ("The key distinction is whether the party has 'accepted and legally bound themselves to transport' a shipment, in which case it is considered a carrier." (quoting 49 C.F.R. § 371.2(a))); *Hewlett-Packard Co. v. Brother's Trucking Enters.*, 373 F.Supp.2d 1349, 1352 (S.D. Fla. 2005) ("Whether a company is a broker or a carrier is not determined by what the

We agree with this approach.  This distinction tracks longstanding common-law rules.  In numerous contexts, courts recognize liability based on the contractual understanding between parties as to who has accepted legal responsibility for performing the terms of the agreement.  Of particular relevance is the common law of bailment, which governed the liability of freight carriers in the days prior to enactment of the ICA and Carmack Amendment.  *See* Thomas R. Skulina, *Liability of a Carrier for Loss and Damage to Interstate Shipments*, 17 Clev-Mar. L. Rev. 251, 251 (1968).  At common law, a bailee was responsible for loss of a bailment if the bailee, without the permission of the bailor, entrusted a sub-bailee with care of the item and the item was lost while in the possession of the third party.  *See, e.g.*, *Wellberg v. Duluth Auto Supply Co.*, 177 N.W. 924, 926 (Minn. 1920) (explaining "[i]t was no defense that the [bailed] property was not in the physical possession" of the bailee with whom the bailor contracted when lost, because the bailor needed to show only that the bailee, as the party assuming legal responsibility for the bailment, "had control of it at the time plaintiff demanded its return, that it refused,

---

company labels itself, but by how it represents itself to the world and its relationship to the shipper."); *Phoenix Assur. Co. v. K-Mart Corp.*, 977 F. Supp. 319, 326 (D.N.J. 1997) ("Mo–Ark's registration as a broker and Mo–Ark's failure to register as a 'carrier' are not dispositive of Mo–Ark's true identity.  Rather, the gravamen of the issue is Mo–Ark's relationships to Fast Track and Red Arrow."); *Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc.*, No. 09 Civ. 2365 (PGG), 2011 WL 671747, at *5 (S.D.N.Y. Feb. 18, 2011) (observing that the distinction between a broker and a carrier depends on whether a party merely arranged transport of a shipment or "exerted some measure of control over the drivers").

or unreasonably neglected, to return it, and that it had been delivered to defendant under the agreement to which plaintiff and his attorney testified").[5]

This time-honored principle stands for the commonsense proposition that when a party holds itself out as the party responsible for the care and delivery of another's property, it cannot outsource its contractual responsibility by outsourcing the care and delivery it agreed to provide.  Neither the Carmack Amendment's language nor its legislative history indicates that Congress intended this principle to operate differently in the interstate-transportation context.  We therefore hold that a party is not a broker under the Carmack Amendment if it has agreed with the shipper to accept legal responsibility for that shipment.

This is necessarily a case-specific analysis, and as a result, summary judgment might not be appropriate in many cases.  *See Nipponkoa Ins. Co., Ltd. v. C.H. Robinson Worldwide, Inc.*, No. 09 Civ. 2365 (PGG), 2011 WL 671747, at *5 (S.D.N.Y. Feb. 18, 2011) ("[I]t is apparent from the case law that the carrier/broker inquiry is inherently fact-intensive and not well suited to summary judgment.").  But the question need not always be difficult.  Even a company like Barrett, which carries some shipments and brokers others, can insulate itself from strict liability

---

[5] *See also Thornton v. Daniel*, 185 S.W. 585, 589 (Tex. Civ. App. 1916) ("[Defendant-bailee] Daniel having received the goods under a contract to store them in his own warehouse, and having actually stored them in his own warehouse under said agreement, was a depositary bailee, and any transfer of the goods by him to any place for storage other than his own warehouse, without the knowledge and consent of appellants, is in legal effect a conversion of the goods.").

with respect to a particular shipment if it makes clear in writing that it is merely acting as a go-between to connect the shipper with a suitable third-party carrier. Where no such writing exists, the question will depend on how the party held itself out to the world, the nature of the party's communications and prior dealings with the shipper, and the parties' understanding as to who would assume responsibility for the delivery of the shipment in question. In any case, the operative inquiry is this: pursuant to the parties' agreement, with whom did the shipper entrust the cargo?

## 2.

The District Court applied the above standard when considering Nationwide's motion for summary judgment against Barrett. The Court concluded that Barrett "acted as a motor carrier, not a broker" because "Nationwide authorized Barrett to transport the MRI and related equipment, and Barrett accepted and legally bound itself to do so."

However, while the Court applied the correct legal standard in this regard, it erred in granting summary judgment because a genuine factual dispute existed as to whether Barrett accepted legal responsibility to transport the magnet or communicated to Nationwide that it was brokering the shipment of the magnet to a third party. Although the District Court reached a reasonable interpretation—or perhaps even the best interpretation—of the evidence, Barrett presented

16

information that would allow the trier of fact to find in its favor as to Barrett's status with respect to the magnet.

On the one hand, Nationwide presented as evidence a screenshot of Barrett's website, which highlighted Barrett's "vast and varied fleet that can handle the most sensitive and specialized medical equipment," and which never mentioned the term "broker."  This could be interpreted as a representation by Barrett that *it personally* could handle shippers' medical equipment with specialized expertise.  The evidence also established that Nationwide negotiated exclusively, through its emails and phone calls, with Barrett in arranging for the shipment of the magnet, which included agreeing upon the price and logistical specifics of the shipment.  Landstar was never named or alluded to in this chain of emails and calls.  Further, Barrett provided the name and cell phone number of one of its own employees as the emergency contact in case something went wrong during the shipment.  And the invoices for the shipments never mentioned Landstar.

On the other hand, Barrett's website stated that their own "fleet include[d] 179 tractors and 280 trailers" but discussed separately Barrett's "affiliation with the UniGroup family of agents," which the website said meant "you can rely on *access* to more than 5,000 trailers."  (Emphasis added).  This could be interpreted to mean that Barrett could carry shipments with its own fleet of trailers or could broker shipments through its UniGroup affiliation.  In the email exchange between

17

Nationwide and Barrett, Barrett never stated that it would transport the magnet itself or provide one of its own drivers.  Barrett presented testimony by Stacey Jacobson that Barrett and Nationwide's prior course of dealings would have put Nationwide on notice that when she told Anne Marie McGuigan she would notify Barrett's "logistics department," this meant that she would seek a third-party carrier to transport the magnet.  According to testimony by Barrett's vice president, Randy Koepsell, use of the term "logistics" in the shipping industry generally "refers to finding alternative transportation."  The factfinder could credit this testimony and reasonably interpret it to establish that Jacobson put Nationwide on notice that she was acting as an intermediary between Nationwide and a third-party carrier to arrange the magnet's shipment.

In granting Nationwide's motion for summary judgment against Barrett, the Magistrate Judge improperly weighed this conflicting evidence.  With regard to Barrett's use of the term "logistics," he stated, "A reasonable person in Nationwide's shoes could not have been expected to know from Barrett's mere reference to its 'logistics dept' that Barrett was attempting to act as a broker on one part of the shipment and as a carrier on the other part of the shipment."  He then stated that Barrett's provision to Nationwide of "a contact name and number of a Barrett employee in case of an emergency during the shipment . . . provid[ed] additional evidence that Barrett was accepting responsibility for and legally

18

binding itself to transport the shipment." Next, he read the invoices for the shipment, which did not mention Landstar, as additional proof that Barrett had accepted legal responsibility to transport the magnet. Finally, he observed that Barrett on its website "held itself out to the world as being a motor carrier of specialized medical equipment," which, according to him, confirmed Barrett's status as a carrier and not a broker. In the Magistrate Judge's view, the evidence presented by Nationwide, "taken into consideration on the whole," was enough to establish "as a matter of law" that Barrett was a carrier. Implicit in this finding—indeed, necessary to it—is the determination that Barrett's conflicting evidence was not persuasive enough to win the day.

This was an exercise in weighing the evidence, an activity that is improper at summary judgment. *See, e.g.*, *Grayson v. Warden, Comm'r, Ala. Dep't of Corr.*, 869 F.3d 1204, 1220 (11th Cir. 2017) ("In deciding whether to grant summary judgment, a district court may not weigh conflicting evidence or make credibility determinations." (quotations omitted)). The Magistrate Judge's reading of the evidence was reasonable, and perhaps it was correct, but such a conclusion would be appropriate only after presentation of the evidence at trial. Put simply, the Magistrate Judge went beyond considering whether a genuine factual dispute existed and instead proceeded to consider the relative strength of the parties' evidence—this despite the existence of enough evidence to support a reasonable

19

trier of fact's finding that Barrett was a broker.  At summary judgment, the only question is whether there is enough evidence upon which "a reasonable jury could return a verdict for the nonmoving party."  *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011).  Summary judgment was therefore improper.

### III.

We next consider whether the Magistrate Judge erred in concluding, in his grant of summary judgment in favor of Nationwide and against Landstar, that Landstar was jointly and severally liable to Nationwide for the full amount of the assessed damages.  Landstar argues that the bill of lading it gave Nationwide when it picked up the magnet contained a liability limitation that capped Landstar's liability for the shipment at $1.00 per pound, and, because this limitation was consistent with Landstar's Broker-Carrier Agreement ("BCA") with Barrett, the limitation was legally operative.  Nationwide says the limitation clause in the bill of lading did nothing for at least two reasons: first, Landstar did not give Nationwide a reasonable opportunity to agree to it; and second, because Barrett's contract with Nationwide served as the final agreement on the terms of the magnet's shipment, the bill of lading and the BCA could not alter those terms.

The Magistrate Judge agreed with Nationwide, finding that "[t]he deal consummated by emails between Barrett and Nationwide is the contract that

20

governed the subject shipment." Thus, "Landstar's Bill of Lading does not modify the contract previously entered into between Nationwide and Barrett."

This finding was incorrect. The Magistrate Judge grounded his findings as to Landstar's limitation of liability in generic contract principles. But our precedent says generic principles do not apply in this context. In *Werner*, we concluded that motor carriers hired by an intermediary between them and the shipper "do not need to investigate upstream contracts." 554 F.3d at 1325. We based our holding on the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 125 S. Ct. 385 (2004). In *Kirby*, the Supreme Court established the default rule for liability limitations in carriage contracts: "When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed." *Id.* at 33, 125 S. Ct. at 398. The Court grounded this rule in considerations of economic efficiency:

> In intercontinental ocean shipping, carriers may not know if they are dealing with an intermediary, rather than with a cargo owner. Even if knowingly dealing with an intermediary, they may not know how many other intermediaries came before, or what obligations may be outstanding among them. If the [lower court's contrary] rule were the law, carriers would have to seek out more information before contracting, so as to assure themselves that their contractual liability limitations provide true protection. That task of information gathering might be very costly or even impossible, given that goods often change hands many times in the course of intermodal transportation.

21

Second, if liability limitations negotiated with cargo owners were reliable while limitations negotiated with intermediaries were not, carriers would likely want to charge the latter higher rates. A rule prompting downstream carriers to distinguish between cargo owners and intermediary shippers might interfere with statutory and decisional law promoting nondiscrimination in common carriage. It would also, as we have intimated, undermine [the Carriage of Goods by Sea Act]'s liability regime.

Finally . . ., our decision produces an equitable result. Kirby retains the option to sue ICC, the carrier, for any loss that exceeds the liability limitation to which they agreed. And indeed, Kirby has sued ICC in an Australian court for damages arising from the Norfolk derailment. It seems logical that ICC—the only party that definitely knew about and was party to both of the bills of lading at issue here— should bear responsibility for any gap between the liability limitations in the bills. Meanwhile, Norfolk enjoys the benefit of the Hamburg Süd bill's liability limitation.

*Id.* at 34–35, 125 S. Ct. at 399–400 (citations omitted).

*Kirby* was controlled by maritime law, *id.* at 18, 125 S. Ct. at 380, but we concluded in *Werner* that "the principles of fairness and efficiency animating the *Kirby* rule" operate equally in contracts for carriage on land. *Werner*, 554 F.3d at 1324–25. We observed:

[Carriers] are entitled to assume that the party entrusted with goods may negotiate a limitation of liability. To hold otherwise would defeat the principle of efficiency that motivated the *Kirby* holding. Moreover, this again produces an equitable result. The cargo owner retains the option to sue the intermediary who failed to protect itself by negotiating a liability limitation.

*Id.* at 1325. Thus, the default rule in the absence of a contrary agreement between the parties is that an intermediary, such as a broker or carrier who initiates the

22

shipment but does not complete it, is deemed to have the limited authority as the shipper's agent to negotiate a liability limitation with a downstream carrier in exchange for a lower shipping rate. And, consistent with that rationale, the shipper and the intermediary must sort out any disputes about damages exceeding such a limitation solely between themselves.

The facts of this case do not justify an exception to the *Kirby/Werner* rule. True, according to Nationwide's version of the case, Nationwide had no clue Barrett was acting as an intermediary at all: unlike in maritime cases in which intermodal transportation cannot be avoided or in ground transportation cases where the shipper knows his product will change hands among carriers multiple times, Nationwide was led to believe that Barrett was the only carrier that would ever see, much less take possession of, its magnet. But even if we accept this version of the facts, the efficiency rationale giving rise to the *Kirby/Werner* rule counsels against rendering a downstream carrier's liability limitation inoperative solely on the basis of an upstream carrier's unilateral misrepresentations to the shipper. There is no allegation that Landstar had actual or constructive knowledge of Barrett's purported misleading of Nationwide. Indeed, from Landstar's point of view, that Landstar was allowed to take possession of the magnet might have confirmed that it was authorized to transport it.

23

As harsh as it might seem with regard to a shipper left in the dark, the *Kirby*/*Werner* rule is primarily for the benefit of the downstream *carrier*. The rule gives the carrier the confidence to know that its liability will be capped by its agreement with the intermediary as opposed to being expanded unexpectedly by a later-surfacing agreement between the shipper and the intermediary. That is why the carrier is allowed to presume that the intermediary has the limited authority as an agent of the shipper to negotiate a liability limitation, even if in reality the shipper has no knowledge of such a negotiation. But if an exception to the *Kirby*/*Werner* rule exists whereby a shipper can, based on misrepresentations by the carrier who initially takes possession of the shipper's cargo about its role in the transaction, impose more liability on a downstream carrier than that contained in the downstream carrier's agreement with that initial carrier, then the rule is less a true protection than an *ignis fatuus*. Downstream carriers would, despite the *Kirby*/*Werner* rule's purported guarantee of limited liability, find themselves compelled to investigate upstream interactions between shippers and antecedent carriers. The exception would swallow the rule entirely. We think the course more equitable and more consistent with the rule's rationale is to make the misrepresenting carrier, not the unknowing downstream carrier, bear the burden of expanded liability to the shipper.

24

Applying *Werner*'s holding here, then, Landstar was entitled to rely on the BCA's limitation of liability, so long as the BCA satisfied the Carmack Amendment's requirements.  As interpreted in this Circuit, the Carmack Amendment requires a carrier to meet a four-part test to effectively limit its liability:

> A carrier must (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission, (2) give the shipper a reasonable opportunity to choose between two or more levels of liability, (3) obtain the shipper's agreement as to the choice of liability, and (4) issue a receipt or bill of lading prior to moving the shipment.

*Werner*, 554 F.3d at 1326.  The first prong of this test has been rendered largely inoperative by statutory changes, *see Megatrux*, 750 F.3d at 1286 n.3, and is not in dispute in this case.  As to the second prong, we again find *Werner* instructive.  We held in *Werner* that "all that is required" to satisfy the second element of the test (a reasonable opportunity to choose the level of liability) is that the intermediary and the downstream carrier "entered into a written contract providing the shipper with a reasonable opportunity to choose between two or more levels of liability."  *Id.* at 1328.  And under the *Kirby*/*Werner* rule's limited-agency framework, the intermediary, or the "the shipper's agent," has the authority to act on the shipper's behalf in this regard.  *See id.* at 1327 ("[I]t is the shipper (or Transpro, the shipper's agent to select limited liability pursuant to *Kirby*) who ultimately has the power to elect higher coverage.").

25

Here, the BCA contained the following limitation clause:

Cargo Liability – CARRIER'S liability for any cargo damage or loss shall be determined under the Carmack Amendment, 49 USC § 14706, and CARRIER shall comply with all applicable federal regulations for processing loss and damage claims and salvage. CARRIER shall be liable for loss or damage to goods being transported or held in Storage-in-Transit in the amount as set forth in any order, billing or shipping documentation applicable to such shipment.  In the event that such liability terms are not set forth in that documentation for the shipment, CARRIER'S maximum liability for loss or damage to any one shipment shall be $100,000; however, if CARRIER allows a shipper to declare a liability amount on the bill of lading in excess of $100,000, then CARRIER'S maximum liability for loss or damage to the shipment shall be the amount declared in writing by the shipper on the bill of lading and shall not be limited to $100,000.

So, the BCA deferred to the bill of lading.  In turn, the bill of lading stated:

Unless a greater value is specified below: which an extra charge will apply, the liability of the carrier for damage or loss to the goods shall be released to the lesser of . . . $1.00 per pound/$50,000 per truckload shipment for shipments of used goods, not to exceed the actual loss.

The bill of lading then supplied a blank line on which the shipper could declare a different value.  Thus, at the time of contracting, Landstar made clear to the shipper's agent that the shipper had the option of accepting whatever liability amount Landstar included on the shipping documentation or writing in a different amount on the blank line provided.  Barrett, a sophisticated entity, agreed to these terms.

That the BCA left Landstar to unilaterally set the baseline liability amount in future shipping documents does not change the analysis, because Barrett could

26

have negotiated a specific liability limitation in the BCA.  For example, in *Werner*,

the governing agreement contained an express limitation amount of $200,000 and

set forth the steps a shipper (or intermediary) could take to choose a different

liability amount.[6]  *See Werner*, 554 F.3d at 1327.   In contrast, here the BCA stated

simply that the amount set forth in the bill of lading or other shipping

documentation would control, unless the shipper chose a different liability level.

But a reasonable opportunity to choose a different liability level and an actual

choice was all that was required under the Carmack Amendment.  Under *Werner*,

this was enough to establish that Nationwide, through its agent Barrett, had a

reasonable opportunity to select between two liability levels, and that Nationwide

elected to abide by the amount Landstar placed on the shipping documentation.

With regard to the shipment at issue, the only liability amount that appeared

on any shipping documentation was the $1.00 per pound limitation.  The shipper

did not declare a different amount.  By the plain terms of the BCA, the $1.00 per

pound limitation therefore applied.  But, says Nationwide, Mark Depew was not an

employee or representative of Nationwide and was not authorized to agree to a

liability limitation on Nationwide's behalf.  This argument is inapposite under the

*Kirby*/*Werner* rule because the BCA had *already* satisfied the Carmack

---

[6] Specifically, the agreement in *Werner* stated, "Carrier's maximum liability for loss or damage to cargo shall not in any event exceed Two Hundred Thousand Dollars ($200,000) per truckload shipment unless a higher degree of liability is specifically assumed in writing by an authorized representative of Carrier." *Werner*, 554 F.3d at 1327.

27

Amendment's "reasonable opportunity" requirement.  Indeed, accepting per the *Kirby*/*Werner* rule that an intermediary acts as a shipper's agent in negotiating a BCA with a downstream carrier, it would defy reason to let the shipper then circumvent the liability limitation in the BCA by leaving an unauthorized person to review and sign the bill of lading when the shipper had constructive notice that the bill of lading was the means by which he could elect a higher liability level. Nationwide might argue that it had no way of knowing that it needed to send a representative to the shipment site to negotiate a liability limitation with Landstar because Nationwide already had an agreement with Barrett and had no idea that Landstar would be showing up at all.  But the *Kirby*/*Werner* rule's agency rationale necessarily assumes constructive knowledge of the downstream carrier's involvement.  Thus, we do not think it compatible with that rationale to hold that the validity of Landstar's prenegotiated liability limitation turns on whether Nationwide's independent contractor had agency authority to agree to the limitation on the bill of lading.  If the BCA governed, and we are required by *Werner* to conclude that it did, and if *it* satisfied the Carmack Amendment's reasonable opportunity test, then the circumstances surrounding Depew's relationship with Nationwide and the adequacy of his signature are of no moment. [7]

---

[7] Nor is Barrett and Nationwide's prior course of dealing relevant.  Landstar alleges that Barrett and Nationwide had a standing agreement wherein Barrett's liability in all its shipments for Nationwide would be limited to $6 per pound; hence, Landstar argues that, in any event, its

That leaves only the fourth prong of the test: whether Landstar issued a bill of lading.  Of course it did: its driver gave the bill to Mark Depew at the shipment site, and Depew admitted he signed it.  Regardless of whether or not Depew was an authorized agent of Nationwide, his receipt of the bill of lading is proof positive that Landstar issued it.

Thus, Landstar was entitled to the $1.00 per pound liability limitation in the bill of lading.

IV.

Accordingly, the District Court's judgments against Barrett and Landstar are vacated, and the case is remanded for further proceedings in accordance with this opinion.

**REVERSED and REMANDED.**

---

liability should be limited accordingly.  Nationwide disputes this and argues that, even if such a prior arrangement existed, the limitation would only apply in shipments in which Barrett gave Nationwide a discounted shipping rate, which it did not do here.  Under the *Kirby*/*Werner* rule, this dispute is solely between Barrett and Nationwide as to Barrett's liability, and it does not alter the fact that the BCA governed Landstar's liability.