NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 17-3768
_____

TRYG INSURANCE, a/s/o Toms Confectionery Group;
TOMS CONFECTIONERY GROUP

v.

C.H. ROBINSON WORLDWIDE, INC.;
NATIONAL REFRIGERATED TRUCKING, LLC;

C.H. Robinson Worldwide, Inc.,
                                        Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D. C. Civil Action No. 3-15-cv-05343)
District Judge: Honorable Michael A. Shipp
_____

Submitted under Third Circuit LAR 34.1(a)
on October 5, 2018

Before:  SHWARTZ, SCIRICA and ROTH, Circuit Judges

(Opinion filed: April 19, 2019)

_____

OPINION*
_____

_____

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

ROTH, Circuit Judge

Toms Confectionary Group, a Danish chocolate company, and Tryg Insurance, its insurer, brought suit against transportation company C.H. Robinson Worldwide (CHRW) after a shipment of Toms' miniature chocolate liqueur bottles was damaged in transit. The central question in this case is whether CHRW is a carrier or a broker. Under the Carmack Amendment to the Interstate Commerce Act of 1887, a carrier is liable for damages incurred during a shipment of goods, whereas a broker—someone who merely arranges for transportation—is not liable.[1] Following a bench trial on the issue of liability, the District Court ruled that CHRW was a carrier rather than a broker and therefore liable for the damages caused to the miniature chocolate liqueur bottles. CHRW urges us to hold that it is instead a broker. Because we find no error in the District Court's determination that CHRW held itself out as a carrier and thus qualified as such under the Carmack Amendment, we will affirm.

**I**

Toms hired CHRW in July 2013 to transport a shipment of miniature chocolate liquor bottles from Levittown, Pennsylvania, to Cranbury, New Jersey. Unbeknownst to Toms, CHRW subcontracted with National Refrigerated Trucking, LLC, (NRT) to transport the chocolate; the agreement between CHRW and NRT contained a confidentiality clause. Due to a malfunction of NRT's truck's refrigeration system, the

---

[1] 49 U.S.C. § 14706.

chocolate melted and was destroyed. Non-party Coregistics, the recipient of the damaged chocolate, completed a non-conformance report on the day of delivery, July 16, 2013, and Toms submitted a claim to CHRW shortly thereafter. CHRW did not accept the claim or pay the loss. Tryg later paid Toms the value of the cargo less Toms' deductible under its insurance policy.

Tryg and Toms brought suit against CHRW for breach of contract of motor carriage.[2] In the course of pre-trial proceedings, the parties stipulated that the amount of damages was $124,034.31. The parties also agreed that CHRW could only be held liable if it were a "carrier" as opposed to a "broker." The court held a bench trial on the issue of liability on May 4, 2017. At trial, Toms called its Customer Service Representative, Michael Bastholm, and CHRW called its Risk Manager for the North American Surface Transportation Division, Christopher McLoughlin. The parties also entered into evidence deposition testimony from an Account Executive at CHRW, Janet Hays, who was Bastholm's point of contact. The District Court found that CHRW possessed a broker's license and not a motor carrier's license, and did not own trucks or other equipment to transport cargo. Nevertheless, based on the testimony and the shipment documents, the court held that CHRW had held itself out as a carrier and was therefore liable for the damages. CHRW now appeals.

---

[2] Plaintiffs also named NRT as codefendants, but NRT failed to appear. The District Court entered a default judgment against NRT and found NRT and CHRW jointly and severally liable. Only CHRW appealed, and so our decision here pertains only to CHRW.

**II**[3]

The statutory text makes clear that being a carrier entails more than just physically picking up shipments and transferring them to a different location. The definition of "carrier" includes "motor carriers," which are defined as "person[s] providing motor vehicle transportation for compensation."[4] The term "transportation" is then defined to include "services related to" (including "arranging for") the movement of property.[5] Thus, the definition of "carrier" encompasses entities that perform services other than physical transportation.

As the District Court correctly stated, in determining whether a party is a carrier or a broker, the crucial question is whether the party has legally bound itself to transport goods by accepting responsibility for ensuring the delivery of the goods.[6] If an entity accepts responsibility for ensuring the delivery of goods, then that entity qualifies as a carrier regardless of whether it conducted the physical transportation. Conversely, if an entity merely agrees to locate and hire a third party to transport the goods, then it is acting

---

[3] On appeal from a bench trial, we review the District Court's findings of fact for clear error and review its conclusions of law de novo. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282-83 (3d Cir. 2014).

[4] 49 U.S.C. § 13102(3), (14). In 1995, Congress passed the Interstate Commerce Commission Termination Act, Pub. L. No. 104–88, 109 Stat. 803, which merged the formerly separate classifications of common and contract carriers into one classification of motor carriers. *M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 132 (2d Cir. 2005).

[5] 49 U.S.C. § 13102(23).

[6] *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1301 (11th Cir. 2018).

as a broker.[7] This distinction "tracks longstanding common-law rules" and derives from the "commonsense proposition that when a party holds itself out as the party responsible for the care and delivery of another's property, it cannot outsource its contractual responsibility by outsourcing the care and delivery it agreed to provide."[8] The Department of Transportation, which is responsible for interpreting the Interstate Commerce Act (of which the Carmack Amendment is a part), has similarly instructed that motor carriers are not brokers just because they "arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport."[9] In sum, if a party has accepted responsibility for transporting a shipment, it is a carrier.

The District Court did not clearly err in determining, based on the testimony presented at trial, that CHRW held itself out as a carrier.[10] As Toms and CHRW had no standing contract, the court assessed their relationship using the parties' course of dealing and communications, in particular between Bastholm and Hays.[11] Hays, the CHRW

---

[7] *See, e.g.*, *id.* at 1301-02; *Nipponkoa Ins. Co. v. C.H. Robinson Worldwide, Inc.*, 2011 WL 671747, at *7 (S.D.N.Y. Feb. 18, 2011); *CGU Int'l Ins., PLC v. Keystone Lines Corp.*, C-02-3751, 2004 WL 1047982, at *2 (N.D. Cal. May 5, 2004).

[8] *Essex Ins. Co.*, 885 F.3d at 1301; *see also id.* (finding nothing in either "the Carmack Amendment's language nor its legislative history [to] indicate[] that Congress intended this principle to operate differently in the interstate-transportation context").

[9] 49 C.F.R. § 371.2(a).

[10] The testimony and documentary evidence distinguish this case from cases like *Travelers Indemnity Co. v. SS "HANJIN KWANGYANG"*, 92 Civ. 5763, 1995 WL 539635 (S.D.N.Y. Sept. 8, 1995), where the only pieces of evidence that an entity acted as a carrier instead of a broker were the complaint and the listing of the entity as a carrier on the bill of lading. *Id.* at *3.

[11] McLoughlin, CHRW's Risk Manager, testified that he never had any contact with anyone at Toms.

Account Executive, indicated to Bastholm, the Toms employee, that CHRW could arrange to ship Toms' goods and "ma[d]e it sound like it[ was] seamless." Bastholm communicated with Hays to schedule shipments and request shipment quotes, and at no point did CHRW make clear that it was acting only as a broker. Bastholm's understanding, based on his course of dealing with Hays, was that CHRW took responsibility for the goods and arranged for their transportation. The parties had an agreement for CHRW to transport the goods, and that is what Toms paid CHRW to do.

The documents submitted into evidence at trial provide further support for the District Court's holding. The Bill of Lading and the packing list, both prepared by non-party Assured Packing Inc., identified CHRW as "carrier," a designation to which CHRW did not object.[12] CHRW's invoice to Toms contained line items for "line haul" and a "fuel surcharge" for 30 miles, the distance between Levittown and Cranbury, consistent with an entity acting as a carrier. The invoice did not refer to brokerage commissions or NRT's role in the transportation. Moreover, despite CHRW's testimony that it had done business with Toms for several years, CHRW could produce no document or communication in which it identified itself to Toms as a broker. In fact, CHRW did not claim it was a broker instead of a carrier until after the start of this

---

[12] While NRT also appears on this document, that does not negate CHRW's role as a carrier.

6

litigation.[13]  While CHRW's Terms and Conditions suggest that CHRW is a non-asset based transportation provider, they do not make clear that CHRW is only a broker, and in any event the Terms and Conditions are only referred to, not included, on the invoice.

CHRW argues that (1) it did not give its consent to be listed as a carrier on the bill of lading, (2) it never took physical possession of the cargo, (3) it entered into an independent contractor relationship with NRT, and (4) Toms' failure to investigate CHRW's services was inexcusable.  None of these arguments will suffice to call into question the District Court's fact-intensive inquiry into the parties' course of conduct and communications or overturn the court's conclusion that CHRW held itself out as a carrier and should be held liable.  We therefore will affirm the judgment of the District Court.

---

[13] The International Surveyors & Adjusters (USA) report on the incident, dated December 4, 2013, does include the information that CHRW "appointed" NRT to conduct the physical transportation, but this knowledge reached Toms long after the incident and does not affect the question of whether CHRW held itself out to Toms as a carrier.  A337.