# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 10, 2024        Decided July 18, 2025

No. 23-5183

CROWLEY GOVERNMENT SERVICES, INC.,
APPELLANT

v.

GENERAL SERVICES ADMINISTRATION AND ROBIN CARNAHAN,
IN HER OFFICIAL CAPACITY AS ADMINISTRATOR OF THE
GENERAL SERVICES ADMINISTRATION,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02298)

———

*James Y. Boland* argued the cause for appellant. With him on the briefs were *Christopher G. Griesedieck*, *Nicholas M. DePalma*, *Kevin W. Weigand*, and *Kelly M. Boppe*.

*Steven H. Hazel*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern*, Attorney, as well as *Alex Demots*, General Counsel of the General Services Administration, and *Dan Hall* and *Aaron Pound*, Assistant General Counsel.

2

Before: WILKINS and GARCIA, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

Dissenting opinion filed by *Senior Circuit Judge* RANDOLPH.

WILKINS, *Circuit Judge*: Crowley Government Services, Inc. ("Crowley") is a federal contractor. In 2016, Crowley and the Department of Defense United States Transportation Command ("USTRANSCOM") reached an agreement concerning Crowley's provision of "transportation coordination services," which required it to engage motor carriers to move USTRANSCOM freight in support of the military's logistical needs. J.A. 104. Years after Crowley began performing under the contract, the Government Services Agency ("GSA")—not itself a party to or involved with the agreement in any way—began auditing bills Crowley had invoiced USTRANSCOM. It did so under a provision of the Transportation Act of 1940 amended by Congress in 1998. That statute, 31 U.S.C. § 3726(b), allows GSA to conduct audits of "transportation bills." To complete its audits and assess whether Crowley appropriately charged the government, GSA interpreted the agreement, but in ways that contradicted the Department's oversight of the contract. GSA, on its read of the contract, believed Crowley overbilled USTRANSCOM by millions of dollars. The agency sought to recover the overcharges by garnishing future payments due to Crowley.

Crowley objects to these audits as an unlawful exercise of GSA's authority. The District Court sided with GSA. We agree with Crowley. After concluding that the case is not moot, we hold that 31 U.S.C. § 3726(b) allows GSA to audit only those bills presented to the government by carriers and freight

forwarders. We further hold that Crowley is not a carrier because it neither physically transports Department of Defense freight, nor is it contractually bound to help perform the movement of goods.[1] Instead, Crowley serves as an intermediary, hiring third-party carriers to move the Department's freight. We therefore reverse the District Court's decision on the scope of § 3726(b).

## I.

## A.

Subsection 3726(b) allows GSA's Administrator to "conduct pre- or post-payment audits of transportation bills of any Federal agency. The number and types of bills audited shall be based on the Administrator's judgment." 31 U.S.C. § 3726(b).

GSA's audit authority and the surrounding § 3726 provisions are part of a statutory scheme that traces its roots to the Interstate Commerce Act ("ICA"), ch. 104, 24 Stat. 379 (1887), and the English and American law of common carriage. In the ICA, Congress "codified the common carriage obligations of rail carriers" and created the Interstate Commerce Commission ("ICC"). *Cellco P'ship v. FCC*, 700 F.3d 534, 545 (D.C. Cir. 2012). Its "great purpose" was to "secure equality of rates" and "destroy favoritism" in the railroad industry. *Id.* (quoting *N.Y., New Haven & Hartford R.R. v. ICC*, 200 U.S. 361, 391 (1906)). But industrialization, the Great Depression, and a changing American economy led

---

[1] Section 3726 at times refers to both carriers and freight forwarders, but the statutory definition of "carrier" includes the term "freight forwarder." 49 U.S.C. § 13102(3). For that reason, and because no party suggests that Crowley is a freight forwarder, we use the term "carrier" as a stand-in for both when no distinction is needed.

to what the ICC called a "transportation problem": the decline of rail carriage and corresponding growth of transportation by land, water, and air. 1938 ICC ANN. REP. 1–5, *reprinted in* 52 I.C.C. 1 (1938). So, Congress amended the ICA in the Motor Carrier Act of 1935, ch. 498, 49 Stat. 543, and the Transportation Act of 1940, ch. 722, 54 Stat. 898, to give the ICC regulatory authority over motor and water carriers. *See Cent. & S. Motor Freight Tariff Ass'n v. United States*, 757 F.2d 301, 309 (D.C. Cir. 1985); *Water Transp. Ass'n v. ICC*, 715 F.2d 581, 589 (D.C. Cir. 1983).

That latter amendment, the Transportation Act of 1940, also included the predecessor to the auditing provision at issue here. It permitted the Executive Branch to audit "any common carrier" and "deduct . . . overpayment[s]" from subsequent bills. § 322, 54 Stat. at 955. Later amendments in 1972, 1982, and 1986 left the audit power largely unchanged. *See* Pub. L. No. 92-550, 86 Stat. 1163 (1972); Pub. L. No. 97-258, 96 Stat. 877 (1982); Pub. L. No. 99-627, 100 Stat. 3508 (1986).

In 1998, Congress passed the Travel and Transportation Reform Act, Pub. L. No. 105-264, 112 Stat. 2350 (1998), which mandated in § 3726(a) that agencies conduct prepayment audits, created the § 3726(b) GSA audit power, granted GSA the authority under § 3726(c) to adjudicate claims that cannot be resolved by the agency or the carrier or freight forwarder with the bill, permitted GSA in § 3726(j) to help agencies with their audits, and otherwise recodified previously existing statutory provisions.

## B.

USTRANSCOM awarded Crowley the Department Freight Transportation Services ("DFTS") contract under the Federal Acquisition Regulation ("FAR"), a regulatory

framework governing federal procurement. *Crowley Gov't Servs., Inc. v. GSA*, No. 21-cv-2298 (BAH), 2023 WL 4846719, at *2 (D.D.C. July 28, 2023). The DFTS contract is a "follow-on" to a previous one; the predecessor agreement "changed the basic business model for moving [certain Department of Defense] freight." J.A. 439. In this new model, the Department sought "transportation coordination services"—"not just transportation"—from a "Third Party Logistics provider to manage [the Department's] freight" and "leverage[] and centrally manage[]" all "freight movements." *Id.*

Crowley and USTRANSCOM's contract delineated a standardized process under which Crowley would provide logistics and coordination services. First, the Department generates a request for transportation for the Contractor. Crowley receives the request, acknowledges it, and then "engage[s] its network of carriers to secure transportation arrangements in accordance with the shipment request." J.A. 147. The carrier "confirms its arrangements" with Crowley and picks up the freight "at the shipper location." J.A. 147–48. At that point, the shipper generates a bill of lading and forwards it to the Department. J.A. 148. Once the shipment is completed, Crowley "bundle[s]" the "shipment movement data, at the bill of lading . . . level" and invoices the third-party payment system, which validates the invoice and pays Crowley. J.A. 149, 269. Crowley then "pay[s] its carriers for shipments *they* transported." J.A. 149 (emphasis added).

In administering a FAR-based contract, USTRANSCOM designated a Contracting Officer to oversee and administer the agreement. *See* 48 C.F.R. § 1.602-2 (2024). Like others governed by the FAR, this contract incorporated the Contract Disputes Act ("CDA") as the dispute resolution scheme. *See Crowley*, 2023 WL 4846719, at *15. The USTRANSCOM

Contracting Officer's interpretations of and decisions about the contract are considered "final" unless Crowley pursues an appeal under the CDA. 41 U.S.C. § 7103(g).

Notwithstanding the USTRANSCOM Contracting Officer's authority over the contract, GSA in 2018 began paying vendors to audit Crowley's performance. *Crowley*, 2023 WL 4846719, at *3. GSA maintained it was authorized to act under 31 U.S.C. § 3726(b). From 2018 until Crowley filed its Complaint in August 2021, GSA issued more than fifty thousand Notices of Overcharge ("NOCs") to Crowley, each alleging Crowley overbilled USTRANSCOM small amounts, which in the aggregate totaled about $37 million. *Id.* To arrive at its overcharge value, GSA interpreted the DFTS contract "across a range of categories," from delivery timelines to performance timetables. *Id.* The agency issued these NOCs even though its interpretation of the contract diverged from that of the USTRANSOM Contracting Officer. To collect on the NOCs, GSA "seized" the overcharged amount by siphoning off money from subsequent contract payments owed to Crowley before they were paid, which GSA asserted was permissible under 31 U.S.C. § 3726(d). *Id.* After Crowley lodged challenges with the USTRANSCOM Contracting Officer to certain NOCs, the Officer issued three Final Decisions—each of which held that GSA's conclusions were "erroneous" and "should not have been issued." *Id.* (internal quotation marks omitted).

All told, GSA has issued Crowley over one hundred thousand NOCs. *Id.* at *3–4. GSA uses money that it garnishes to fund its Transportation Audit Division. 31 U.S.C. § 3726(e). And, notwithstanding this yearslong litigation, USTRANSCOM recently awarded Crowley the DFTS II contract, which follows the DFTS I agreement at issue here.

## C.

Despite the Contracting Officer's view that the contested NOCs were erroneous, USTRANSCOM asserted that it "lacked the authority to order GSA to refund Crowley's seized payments." *Crowley*, 2023 WL 4846719, at *3. In response, Crowley initiated two lawsuits. First was in the United States Court of Federal Claims, where Crowley primarily alleges a breach of contract claim against USTRANSCOM for nonpayment. *Id.* at *4. In that litigation, which is stayed pending resolution of this case, Crowley seeks to recover $11.8 million taken in allegedly unlawful offsets. *Id.* at *4, 8.

Crowley also filed the instant suit in the United States District Court for the District of Columbia. The Complaint alleges a violation of the Administrative Procedure Act ("APA") arising from GSA's purported misinterpretation of § 3726(b) to allow the contested audits. Crowley alleges that GSA's audit authority extends only over bills presented for payment by carriers or freight forwarders—and that Crowley is neither. Crowley thus sought a declaratory judgment that GSA is not permitted to audit the DFTS contract under 31 U.S.C. § 3726(b). Further, Crowley asked the District Court to declare that the NOCs "violate the finality of the Contracting Officer's final decisions" and that GSA lacks authority to contradict the Officer's determinations. J.A. 32. Aside from declaratory relief, Crowley requested an injunction prohibiting GSA from "conducting any further such audits and issuing such NOCs." *Id.*

Without reaching the merits, the District Court granted GSA's motion to dismiss for lack of jurisdiction. *Crowley Gov't Servs., Inc. v. GSA*, No. 21-2298, 2021 WL 4940953, at *7–11 (D.D.C. Oct. 22, 2021). It held that Crowley's APA claims were, at bottom, contractual and thus fell within the

exclusive jurisdiction of the Court of Federal Claims. *Id.* at *11. Our Court reversed, finding that Crowley's suit in the District Court was not "in essence" a contract claim because the source of the right at issue was not contractual in nature, and because Crowley sought non-monetary (*i.e.*, declaratory and injunctive) relief. *Crowley Gov't Servs., Inc. v. GSA* (*Crowley I*), 38 F.4th 1099, 1108–13 (D.C. Cir. 2022) (applying *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

On remand, the District Court rejected Crowley's § 3726(b) argument and held that GSA can audit both carriers and non-carriers. To start, it noted that the relevant ICA definitional section, 49 U.S.C. § 13102, does not define "transportation bills." *Crowley*, 2023 WL 4846719, at *17. It then looked to "transportation" as defined by 49 U.S.C. § 13102(23), which includes "'services related to' the movement of passengers or property." *Id.* (quoting 49 U.S.C. § 13102(23)). And the court paired that definition with the "ordinary meaning" of "bill"—"an itemized account of the separate cost of goods sold, services performed, or work done." *Id.* (quoting *Bill*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/bill) (internal quotation marks omitted). On that basis, it concluded that the term "transportation bill" is "simple and far-reaching, covering all itemized accounts of the costs of services rendered to the United States government related to the movement of people or property." *Id.*

Because the District Court construed subsection 3726(b) as permitting GSA audits of carriers and non-carriers alike, it did not determine whether Crowley is a carrier. *Id.* at *18 & n.18. Nevertheless, the District Court agreed with Crowley that the USTRANSCOM Contracting Officer's interpretations govern any GSA audits and that the CDA's dispute resolution

scheme, not the administrative review procedure in § 3726(c), applies to Crowley's claims. The court thus enjoined GSA from issuing Crowley NOCs contrary to the Contracting Officer's determinations about the contract and further declared that all disputed NOCs must be channeled through the CDA process. These rulings are not under review.

Crowley timely appealed. Before us is the District Court's denial of declaratory and injunctive relief on the scope of § 3726(b). We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review the District Court's interpretation of § 3726(b) *de novo*. *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1297 (D.C. Cir. 2023). Because we agree with Crowley that § 3726(b) permits only audits of carriers and freight forwarders, and because we further hold that Crowley is neither, we reverse the District Court's decision on the scope of § 3726(b) and remand for further proceedings.

## II.

We first consider whether Article III of the Constitution grants us power to hear this case. Federal courts may only "resolve 'actual, ongoing controversies.'" *Trump v. Mazars USA, LLP*, 39 F.4th 774, 785 (D.C. Cir. 2022) (quoting *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019)). We lose jurisdiction over a case—and must dismiss it as moot—"when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).

Below, GSA argued the case was mooted by its mid-litigation declaration that it would cease auditing the DFTS agreement and a separate contract. The District Court denied the government's motion to dismiss after applying the

voluntary cessation exception, *Crowley*, 2023 WL 4846719, at *9–14, which prevents a defendant from mooting a case merely by ceasing the challenged conduct, *FBI v. Fikre*, 601 U.S. 234, 241 (2024). GSA abandoned its mootness argument on appeal. Appellee's Br. 10 n.2. But we have an "'independent obligation' to ensure that appeals before us are not moot." *Mazars*, 39 F.4th at 785 (quoting *Planned Parenthood*, 942 F.3d at 516).

While GSA initially triggered the voluntary cessation framework by deliberately attempting to moot the case, the sole event that now raises mootness concerns is the expiration of the DFTS I contract. At oral argument in September 2024, Crowley's counsel indicated that the DFTS I agreement would "run at least four to six more months," Oral Arg. Tr. 26:18–21, meaning it expired at least three months ago. USTRANSCOM has since awarded Crowley the DFTS II contract. *See id.* at 25:21–25; Supp. App. Ex. A, at 27, *Crowley Gov't Servs., Inc. v. GSA*, No. 23-5183 (D.C. Cir. Mar. 10, 2025), Dkt. No. 2104739. According to our dissenting colleague, this sequence of events conclusively mooted Crowley's lawsuit. Dissenting Op. 1–6.

Not so. A case becomes moot "only when it is *impossible* for a court to grant '*any* effectual relief whatever' to the prevailing party." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 442 (D.C. Cir. 2020) (emphasis added) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (quoting *Chafin*, 568 U.S. at 172). Crowley readily clears that bar, and the case is not moot, for two reasons.

*First*, Crowley retains an interest in declaratory relief from this Court because it may affect Crowley's related lawsuit in

the Court of Federal Claims. There, Crowley seeks $11.8 million dollars in damages from deducted payments. *See supra* Section I.C. Damages claims, "if at all plausible, ensure a live controversy." *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019). "Ultimate recovery on [a demand for money] may be uncertain or even unlikely for any number of reasons," yet "[i]f there is any chance of money changing hands, [a] suit remains live." *Id.*

The dissent insists otherwise because Crowley seeks damages in the Claims Court, not here. It thus suggests that Crowley's interest in today's decision is an "advisory opinion" in its favor. Dissenting Op. 2. But the dissent errs because a court may "entertain a request for a declaration that could resolve a damages claim advanced only in a parallel action." 13C WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3533.3 & n.17 (3d ed. Supp. 2025); *see also Me. Cent. R.R. Co. v. Bhd. of Maint. of Way Emps.*, 813 F.2d 484, 486–87 (1st Cir.), *cert. denied*, 484 U.S. 825 (1987) (holding that lawsuit seeking injunction and declaratory judgment was not moot because parallel damages suit was live and might be affected by equitable relief); *cf. Powell v. McCormack*, 395 U.S. 486, 495–500 (1969) (rejecting argument that action for injunction, declaratory judgment, and backpay was moot because plaintiff should have sought damages in Court of Claims).

The weight of authority from our Court endorses this approach. *See, e.g.*, *Mine Reclamation Corp. v. FERC*, 30 F.3d 1519, 1523 (D.C. Cir. 1994) (case not moot where judicial resolution would affect "on-going litigation within the Department of the Interior"); *Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989) (crediting "the not insignificant point" that a favorable decision "may provide the basis for a subsequent action for money damages in the United States Court of Claims"); *British Caledonian*

*Airways Ltd. v. Bond*, 665 F.2d 1153, 1158 n.2 (D.C. Cir. 1981) (finding case not moot in part because plaintiffs "intend[ed] to take any judgment in their favor to the Court of Claims in an attempt to recover money damages"); *see also Unión de Empleados de Muelles de P.R., Inc. v. Int'l Longshoremen's Ass'n*, 884 F.3d 48, 58–59 (1st Cir. 2018) (noting that a declaratory judgment is "often a means to an end rather than an end in and of itself" and holding that case was not moot, in part because a favorable declaratory judgment could be used "for the purposes of a subsequent challenge"). Two circuits have reached the opposite conclusion, but only when the parallel damages claim is hypothetical, which is inapplicable to Crowley's pending lawsuits. *See Schell v. OXY USA Inc.*, 814 F.3d 1107, 1115 (10th Cir. 2016) (finding that "potential preclusive effect[]" of a declaratory judgment in a "hypothetical" suit was not "a legally cognizable interest that w[ould] defeat mootness"); *CFTC v. Bd. of Trade of Chi.*, 701 F.2d 653, 656 (7th Cir. 1983) (refusing to reach merits solely because preclusive effect of judgment might help litigant in future, speculative case).

For mootness purposes, we cannot say that Crowley lacks *any* interest in a declaratory judgment that implicates a core issue in its parallel damages suit. The dissent fundamentally missteps by failing to grasp that we consider the Claims Court litigation because mootness doctrine calls for us to do so. One unmistakable effect of the challenged audits is that Crowley was deprived of millions of dollars in compensation for services it rendered to the government. Although that money is not the subject of this case, the damages claim is viable and unquestionably live, *Mission Prod. Holdings*, 587 U.S. at 377, and our decision may (although it certainly may not) prove useful to Crowley in its quest for damages in the Court of Federal Claims. That possibility defeats any mootness argument and preserves our jurisdiction.

Our mootness holding comports with how the Claims Court has treated Crowley's damages action. In that case, the Court of Federal Claims found good cause to stay litigation pending resolution of the "related legal issues" in this appeal. Order, *Crowley Gov't Servs., Inc. v. United States* (*Crowley*), No. 21-1405 (Fed. Cl. Dec. 15, 2023), Dkt. No. 75. Crowley's motion seeking a stay, which the government did not oppose, explained that the "interpretation of 31 U.S.C. § 3726(b) is relevant to [its] monetary claims." Unopposed Mot. to Stay Case, *Crowley*, No. 21-1405 (Fed. Cl. Dec. 1, 2023), Dkt. No. 71. If resolving the merits of this case truly "intrude[d] on the exclusive jurisdiction" of the Claims Court and the Federal Circuit as the dissent proclaims, Dissenting Op. 1, staying the damages claim would make no sense.

The dissent also is flat wrong about its related argument— that the only consequence of the Court's merits holding is to serve as a "predicate" for Crowley to seek damages in the Court of Federal Claims. *Id.* at 3 (quoting *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1321 (Fed. Cir. 2004)). *Christopher Village* is inapposite. That case rests on the Federal Circuit's conclusion that the APA's waiver of sovereign immunity applies—and a court may exercise jurisdiction to conduct APA review—only where "there is no other adequate remedy" available. *Christopher Village*, 360 F.3d at 1327 (emphasis omitted) (quoting 5 U.S.C. § 704). The Federal Circuit thus found a Fifth Circuit declaratory judgment to be void (and lack preclusive effect) because an adequate remedy existed in the Claims Court. *Id.* at 1327–29. Our Circuit's cases are clear, however, that the APA's "adequate remedy bar . . . determine[s] whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017); *see also Crowley I*, 38 F.4th at 1113 & n.11.

14

The dissent's reading of *Christopher Village* cannot be squared with *Perry* and *Crowley I* because we have jurisdiction to conduct APA review and issue a declaratory judgment with preclusive effect. It is not clear, though, that even the dissent's understanding compels the Claims Court to treat as "void" the judgment that follows from this decision. The reasoning in *Christopher Village* relied in part on the fact that under *Fifth Circuit precedent*, the existence of an adequate remedy defeated the APA's waiver of sovereign immunity, meaning the Fifth Circuit lacked jurisdiction to issue the declaratory judgment not only under Federal Circuit precedent, but also under its own. *See Christopher Village*, 360 F.3d at 1329 ("The Fifth Circuit itself has repeatedly emphasized the limited nature of the APA's waiver of sovereign immunity where there is an adequate remedy in the Court of Federal Claims."). The same is not true here; our precedent is clear that the adequate remedy bar does not limit the APA's waiver of sovereign immunity and is not jurisdictional. *See Perry*, 864 F.3d at 619–20 (explaining that sovereign immunity is "jurisdictional in nature," but that this Court views "the adequate remedy bar not as a condition of immunity, but instead as a requirement for a cause of action").

Accordingly, assuming the dissent frames the issue correctly, the Federal Circuit will face a different question when applying any judgment following this decision: What effect does a judgment have when the issuing court—under its own valid reading of the law—possessed jurisdiction? The Federal Circuit may reach a different conclusion than it did in *Christopher Village*, particularly given that "the fact that a court did not have jurisdiction over a suit in which it issued a decision does not automatically strip that decision of preclusive effect." *Christopher Village*, 360 F.3d at 1329. Moreover, at least one circuit (our own) has come to a different view of the adequate remedy bar since *Christopher Village* was decided.

*See Perry*, 864 F.3d at 620–21 (citing *Cohen v. United States*, 650 F.3d 717, 731 (D.C. Cir. 2011) (en banc)). Given this shift by one of its "sister circuits," *Christopher Village*, 360 F.3d at 1328, the Federal Circuit could change its stance on the adequate remedy bar (or could apply the bar differently here).[2]

The Federal Circuit would have even more reason to find that Crowley's action does not implicate the APA's adequate remedy bar under its own precedent. The Federal Circuit's animating principle in enforcing that bar is "[t]o thwart . . . attempted forum shopping." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). But under both our and the Federal Circuit's precedent, this Court properly has subject matter jurisdiction over Crowley's suit under 5 U.S.C. § 702 because it "is not founded on a contract." *Crowley I*, 38 F.4th at 1109 (internal quotation marks omitted); *see also Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1298 (Fed. Cir. 2022); *accord Doe v. United States*, 372 F.3d 1308, 1313–14

---

[2] The dissent contends that we are assuming that sovereign immunity is not jurisdictional. Dissenting Op. 5. But that is not our argument. Our point is that in *Christopher Village*, the Federal Circuit concluded that under both its and the Fifth Circuit's precedent, the "adequate remedy" bar of 5 U.S.C. § 704 conditioned the scope of the APA's waiver of sovereign immunity. *See* 360 F.3d at 1327, 1329. Because the Federal Circuit believed that suit in the Claims Court for money damages provided an adequate remedy for the only claim still live at the time the Fifth Circuit issued its judgment, it held that the Fifth Circuit lacked jurisdiction to provide that relief. *Id.* at 1329. But our court, as noted above, has squarely held that Section 704's adequate remedy bar is *not* a condition on the APA's waiver of sovereign immunity and is instead a non-jurisdictional aspect of an APA cause of action. *See Perry*, 864 F.3d at 620. So whether there is another adequate remedy or not, Section 704's adequate remedy bar does not affect our jurisdiction.

(Fed. Cir. 2004) (construing *Christopher Village* to mean that the adequate remedy bar was inapplicable when "the plaintiff's claim for relief [was not] simply a request for money damages disguised as a request for an order granting injunctive relief, or in which the grant of equitable relief would give the plaintiff nothing more than an award of damages"). It does not "dress[] up a claim for money as one for equitable relief." *Suburban Mortg. Assocs.*, 480 F.3d at 1124.

Indeed, the analog to Crowley's Complaint here is a "tort action" for "tortious interference with contractual relations," a claim it "could not bring" in the Claims Court. *Crowley I*, 38 F.4th at 1109. It cannot be said that Crowley was engaged in forum shopping when it filed this suit in district court. Moreover, we recognized that Crowley seeks "a host of non-monetary benefits" that affect its "business operations and professional reputation." *Id.* at 1111. To the extent any benefits no longer are implicated because the DFTS I agreement expired, others, including those to reputational harms, may still be remediated by equitable relief. For our purposes, declaratory relief affects these "concrete interest[s], however small," which contributes to our finding that this case is not moot. *Zukerman*, 961 F.3d at 442 (quoting *Chafin*, 568 U.S. at 172).

At bottom, we cannot control how a court in another jurisdiction applies the law, and it ultimately is for the Court of Federal Claims and the Federal Circuit to decide what, if any, preclusive effect or persuasive value attaches to our decision. *Cf. Christopher Village*, 360 F.3d at 1333.[3] But despite that

---

[3] Acknowledging that we cannot control how the Federal Circuit decides its cases does not, as the dissent proclaims, make this an advisory opinion. *Cf.* Dissenting Op. 2 n.4 (citing *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023)).

uncertainty—and the ever-present possibility that another court may view our jurisdiction differently than we do—our precedents have repeatedly indicated that a case may be saved from mootness where a declaratory judgment has the potential to impact a concrete interest pending before another decisionmaker. *See supra* pp. 11–12. And the dissent has cited no contrary case, in which our Court faced similar circumstances and ceded jurisdiction because of another court's *potentially* different reading of the law on a question that court has not yet decided.

Several features of Crowley's pending challenge to the DFTS II agreement, which subjects Crowley to GSA audits and deems Crowley a carrier, Supp. App. Ex. A, at 51, 58, *Crowley Gov't Servs., Inc. v. GSA*, No. 23-5183 (D.C. Cir. Mar. 10, 2025), Dkt. No. 2104739, confirm our view that the Claims Court need not treat any judgment following this decision as "void." For one, the Court of Federal Claims has not adjudicated the merits of the § 3726 interpretive question. Crowley validly protested the legality of the DFTS II audit and carrier provisions before it was awarded the contract. *Crowley Gov't Servs., Inc. v. United States*, 171 Fed. Cl. 453, 458 (2024); *see also* Supp. App. Ex. D, at 224–39, *Crowley Gov't Servs., Inc. v. GSA*, No. 23-5183 (D.C. Cir. Mar. 10, 2025), Dkt. No. 2104739 (protesting both as contrary to law). Although the dissent notes that the "Claims Court . . . rejected Crowley's complaint" contesting the DFTS II audit provision, Dissenting Op. 7, it did so not by addressing the merits of Crowley's arguments, but by finding that Crowley was precluded from relitigating the issue it lost in the District Court in this case. *Crowley*, 171 Fed. Cl. at 461–63. In short, the

very ruling we reverse today was the sole basis for applying issue preclusion.[4]

What's more, the Federal Circuit has suggested that this appeal has *some* connection to the DFTS II suit. Currently, the Court of Federal Claims decision concerning the new contract is pending before the Federal Circuit, which granted an unopposed request to hold briefing in abeyance until resolution of this case. *See* Order, *Crowley Gov't Servs., Inc. v. United States*, No. 24-2121 (Fed. Cir. Aug. 14, 2024), Dkt. No. 9. Had the Federal Circuit deemed *Christopher Village* controlling (as the dissent suggests), it would not have held the case in abeyance. Instead, it is far more likely that the Federal Circuit recognized that the resolution of *whether* the DFTS II agreement may, consistent with § 3726(b), subject Crowley to

---

[4] Nor is the dissent on better footing when it says the Claims Court addressed the government's ability to dictate contract terms. Dissenting Op. 7. The Claims Court held that USTRANSCOM can designate Crowley a "carrier" for audit purposes. *Crowley*, 171 Fed. Cl. at 463–65. But Crowley has appealed that ruling too, and it is unclear whether the court viewed the "carrier" designation as independent of the issue-precluded question of whether "GSA has audit authority" in the first instance. *Id.* Further, even if the Claims Court considered Crowley a "carrier" under the DFTS II contract, Crowley's designation under the DFTS I agreement is an issue that we resolve in Crowley's favor. *See infra* Part IV. We thus reach the question that the Claims Court did not address—what § 3726, and not any contract, says about Crowley's carrier status—even though that court acknowledged USTRANSCOM's ability to set contract terms only "so long as they do not contravene statute." *Crowley*, 171 Fed. Cl. at 464. At any rate, setting aside the "carrier" question, the Claims Court still did not resolve (and instead considered precluded) the antecedent issue: whether GSA has authority under § 3726 to audit a FAR-based contract. *See id.* at 463. Our resolution of GSA's audit power unquestionably affects the DFTS I agreement and may affect the DFTS II arrangement.

GSA audits implicates the same underlying legal question at issue here. That is particularly likely where GSA has pledged to continue committing the same legal wrong under the DFTS II contract that Crowley alleges in its Complaint. Post-abeyance, the Federal Circuit's decision on the Claims Court's application of issue preclusion, along with its resolution of the merits questions about the DFTS II audit provision and its designation of Crowley as a carrier, may be influenced, at least in part, by our holding here. The dissent therefore defies rationality by suggesting that the DFTS II agreement "show[s] beyond any doubt that the [Court] should have declared this case moot." Dissenting Op. 7.

*Second*, even if we were wrong to conclude that Crowley has a sufficient interest in declaratory relief both on its own and due to its effect on the parallel damages suit, this case is not moot because Crowley challenges an ongoing GSA policy. Our precedent is clear that "if a plaintiff's allegations go not only to a specific agency action, but to an ongoing policy as well," the plaintiff may seek declaratory relief notwithstanding a "moot or otherwise fully resolved" claim, so long as the plaintiff has standing and the claim is ripe for review. *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1429–30 (D.C. Cir. 1994); *see also Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009); *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 606 F.3d 780, 786 n.\* (D.C. Cir. 2010).

Crowley raised this argument in the District Court as a basis for rejecting the government's mootness arguments. Pl.'s Opp'n to Def.'s Mot. to Dismiss 19–21, *Crowley*, No. 21-cv-2298, 2023 WL 4846719 (D.D.C. July 28, 2023), Dkt. No. 71. Although the District Court dispensed with mootness issues on the voluntary cessation exception, it also correctly recognized that GSA has an "ongoing and consistent policy, pursuant

to . . . [its] interpretation of its statutory authority under 31 U.S.C. § 3726(b)." *Crowley*, 2023 WL 4846719, at \*10. The ongoing policy doctrine suits Crowley's challenge in this litigation. To be sure, Crowley's Complaint primarily seeks relief with respect to GSA's audits under the DFTS I agreement. *See* J.A. 32. But Crowley also vigorously disputes an ongoing agency policy that it believes contravenes GSA's statutory authority. *See* J.A. 29 (Compl. ¶ 107) ("Crowley seeks . . . declaratory and injunctive relief to avoid the irreparable harm caused by a federal agency acting outside the powers granted it by Congress."); J.A. 26 (Compl. ¶¶ 88–90) (outlining GSA's policy); Oral Arg. Tr. 5:25–6:1 ("[GSA has] taken the view that [it has] the authority to audit contracts. They intend to audit the next contract . . . .").

GSA has no power to "exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (internal quotation marks omitted); *see also NRDC v. Regan*, 67 F.4th 397, 404 (D.C. Cir. 2023) (applying *Brown* to hold agency acted in excess of statutory authority); *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546, 553–58 (D.C. Cir. 2020) (same). It is this authority that Crowley challenges. Because Crowley has standing to challenge GSA's policy,[5] and that challenge is ripe

---

[5] The record reveals an "imminent," and "not conjectural or hypothetical" injury to Crowley's "concrete and particularized" interest. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). For over two decades, Crowley has performed "at least one FAR-based transportation-related contract." J.A. 639. And, over two years ago, Crowley confirmed its intent to participate in the procurement process for the DFTS II agreement, *id.*, which it later was awarded. This is sufficient to satisfy Article III. *Cf. Adarand Constructors, Inc. v. Pena*, 515 U.S.

for review,[6] Crowley's interest in a declaratory judgment concerning the ongoing audit practice makes this a live controversy.[7]

Underlying two of Crowley's interests in declaratory relief—the impact on its damages claim and its challenge to an ongoing policy—is a core mootness principle: "This is not a case where a decision would address a hypothetical state of facts." *Chafin*, 568 U.S. at 173 (internal quotation marks

---

200, 212 (1995) (finding Article III injury requirement satisfied when agency on average had one and a half contracts per year that could injure company); *City of Houston*, 24 F.3d at 1430 (noting plaintiff met standing requirement for challenge to ongoing policy when it received yearly entitlements and "so presumably would be at sufficiently imminent risk of [future] injury").

[6] To determine ripeness, we evaluate the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Nat'l Air Traffic Controllers Ass'n*, 606 F.3d at 786 n.* (internal quotation marks omitted). Crowley's APA challenge to GSA's interpretation of § 3726(b) is a "purely legal question about the meaning of [a] statutory phrase" and, therefore, ripe for review. *Kaufman v. Nielsen*, 896 F.3d 475, 483 (D.C. Cir. 2018). To the extent the carrier question involves factual development, the issue remains fit for review because the record on appeal contains both DFTS I and DFTS II contracts. And, hardship here is "largely irrelevant" because "neither . . . [GSA] nor the court has a significant interest in postponing review." *Id.* (cleaned up).

[7] The dissent appears to confuse the interests that are sufficient to keep an otherwise mooted case alive for the requirements to bring a cause of action under the APA in the first instance. *See* Dissenting Op. 8–9. Its claim that a challenge to an ongoing policy is not a "final agency action" for purposes of an APA challenge, *id.* at 9, has no bearing on the mootness analysis. In fact, we already recognized in *City of Houston* that an otherwise moot APA challenge to a specific agency action is not moot when the lawsuit also challenges an ongoing policy. 24 F.3d at 1428.

omitted). Instead, "there is not the slightest doubt that there continues to exist between the parties that concrete adverseness which sharpens the presentation of issues." *Id.* (internal quotation marks omitted). Accordingly, we decline the dissent's invitation to ignore settled precedent in favor of a strained understanding of what Crowley alleges and how this case relates to pending litigation. The case is not moot.

## III.

At issue is how to interpret § 3726(b)'s reference to GSA's audit authority. Recall the text: "The Administrator may conduct pre- or post-payment audits of transportation bills of any Federal agency. The number and types of bills audited shall be based on the Administrator's judgment." 31 U.S.C. § 3726(b). Crowley primarily contends that § 3726(b) must be read in context; on that view, Section 3726 as a whole covers only carriers and freight forwarders. Otherwise, § 3726(b) becomes incongruous with its companion provisions. GSA resists Crowley's approach and asks us to adopt the District Court's approach: interpret the scope of § 3726 by looking only to the statutory definition of "transportation" and the plain meaning of "bills." We conclude that the statutory text and context, along with its history, all point to the same interpretation. GSA may only audit bills presented by carriers and freight forwarders.

## A.

To interpret a statute, we must start with the text *and* statutory context. *Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024) ("The text must be read in the context of the entire statute." (citing *Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020); *Petit v. U.S. Dep't of*

*Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012))). So, a word on the provisions surrounding § 3726(b) is in order.

Alongside the audit provision are several others directed at transportation bills. The preceding subsection requires agencies receiving a bill "from a carrier or freight forwarder" to conduct prepayment audits, 31 U.S.C. § 3726(a)(1), but allows GSA to exempt agencies, bills, or modes of transportation from that requirement because of considerations like "cost effectiveness" and the "public interest," *id.* § 3726(a)(2). Section 3726 also details how disputes about audits and potential overcharges are resolved: GSA has authority to adjudicate timely claims "which cannot be resolved by the agency procuring the transportation services, or the carrier or freight-forwarder presenting the bill." *Id.* § 3726(c)(1). Then, § 3726(d) permits the government to collect on overcharges by deducting money from future payments "due [to] a carrier or freight forwarder" and delineates how deductions are calculated. *Id.* § 3726(d). Elsewhere the statute discusses how GSA funds audits—from "overpayments collected from carriers on transportation bills paid by the Government and other similar type refunds." *Id.* § 3726(e). And the statute directs GSA to transfer all deductions it receives to the United States Treasury, except for money it expects to "refund[] to carriers" or use for audit program administration. *Id.* § 3726(f).

Subsection 3726(b) does not explicitly address carriers or freight forwarders. Nor is the term "transportation bills" defined in § 3726. But Title 49's subchapter for carriers, brokers, and freight forwarders defines each of these terms, as well as "motor carrier" and "transportation." 49 U.S.C. § 13102. A "broker" is defined as a "person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds

itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." *Id.* § 13102(2). A "carrier," on the other hand, "means a motor carrier, a water carrier, and a freight forwarder." *Id.* § 13102(3). And a "motor carrier" is "a person providing motor vehicle transportation for compensation." *Id.* § 13102(14). Transportation, in turn, includes:

> (A) a motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and

> (B) services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.

*Id.* § 13102(23)(A)–(B).

**B.**

With the relevant context in mind, we return to the scope of § 3726(b). A statutory provision read "[i]n complete isolation . . . might be amenable to [one] reading." *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023). "But [a court] has a 'duty to construe statutes, not isolated provisions.'" *Id.* (quoting *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010)). Simply referencing the dictionary definition of "bills" may produce the sweeping construction that GSA offers and the District Court reached. Yet "a statute's meaning does not always turn solely on the broadest imaginable definitions of its

component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018)). And "[w]hen we consider [subsection 3726(b)] alongside its neighboring [Transportation Act] provisions, it becomes overwhelmingly evident," *Turkiye*, 598 U.S. at 275–76, that § 3726(b) does not permit GSA to audit bills presented by non-carriers.

Try as it might to isolate § 3726(b) from its surrounding provisions, GSA cannot avoid the obvious: Section 3726 offers an integrated scheme for transportation auditing, payment, reductions, and dispute resolution. *See supra* Section III.A. The agency's own regulations admit as much. *See* 41 C.F.R. § 102-118.400 (2024) ("The audit may also include subsequent adjustments and collection actions . . . ."). And, precedent confirms that reading. *See, e.g.*, *Mohawk Airlines, Inc. v. Civ. Aeronautics Bd.*, 329 F.2d 894, 897 (D.C. Cir. 1964) (per curiam) (noting Board "first pays carriers' claims as presented, then audits them and deducts any overpayments"); *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 60–61 (1956) (describing billing, payment, audit, and then deductions of carriers, there railroads).

Because § 3726 explicitly addresses only carriers and freight forwarders, *see* 31 U.S.C. § 3726(a)(1), (c)(1), (d), (e), (f), (h), (i)(1), the best interpretation of subsection (b) incorporates that limitation as well. In § 3726, Congress used the phrase "a bill from a carrier or freight forwarder," *id.* § 3726(a)(1); elsewhere, just "bills," *id.* § 3726(a)(2), "a bill," *id.* § 3726(d), (h), or "the bill," *id.* § 3726(c)(1), (d); and still other times, "transportation bills," *id.* § 3726(b), (e). *Cf. United States v. N.Y., New Haven & Hartford R.R. Co.*, 355 U.S. 253, 254–56 (1957) (similarly referring to transportation bills in various ways for § 3726(b)'s predecessor provision). We see no reason why the terms "bill" or "bills" would mean

something different in the various subsections of § 3726, as they are interrelated and pertain to the billing, auditing, payment, and deductions of bills from carriers. Thus, to give effect to the entirety of § 3726, each use of the term "bills" must address only those from carriers or freight forwarders, even when an individual provision like § 3726(b) omits reference to carriers and freight forwarders. In that way, § 3726 speaks only to carriers and freight forwarders.[8]

Aside from its plain-meaning argument, the government's primary textual response is that understanding § 3726 as an integrated scheme upends Congress's omission of "carrier" and "freight forwarder" from § 3726(b). As such, the government asks us to "give effect to, not nullify, Congress's choice to include limiting language in some provisions but not others." Appellee's Br. 19–20 (quoting *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 431 (2022)). GSA also argues that reading § 3726(b) to cover only carriers would render "the statute's [other] express references to carriers . . . superfluous."

---

[8] GSA resists this understanding of Section 3726 by passing reference to a separate provision, 49 U.S.C. § 13101(a), which enshrines some of the ICA's transportation goals. Appellee's Br. 20–21. The government claims that statute's nod to transportation "overs[ight]" and policy "[i]n general" supports its view that Section 3726 sweeps broader than carriers and freight forwarders. *Id.* (quoting 49 U.S.C. § 13101(a), (a)(1)). That argument misses the mark. Aside from the fact that 49 U.S.C. § 13101(a) is not part of the integrated audit scheme, the statute cited by GSA is itself codified in "Part B" of Title 49, which addresses only "Motor Carriers, Water Carriers, Brokers, and Freight Forwarders." 49 U.S.C. § 13101. Nor is GSA's position saved by pointing to other regulatory provisions addressing brokers. Appellee's Br. 21. Brokers historically were regulated as a category apart from carriers, so it makes sense to find ICA provisions regulating them. *See infra* Section IV.A. But in crafting § 3726, Congress singled out only carriers and freight forwarders, not brokers.

Appellee's Br. 19 (citing *Cmty. Oncology All., Inc. v. OMB*, 987 F.3d 1137, 1141 (D.C. Cir. 2021)).

Those concerns are misplaced. For one, the interpretive principle on which GSA relies, about giving effect to limiting language, "is not absolute." *Bartenwerfer v. Buckley*, 598 U.S. 69, 78 (2023). "Context counts, and it is sometimes difficult to read much into the absence of a word that is present elsewhere in a statute." *Id.*; *see also Field v. Mans*, 516 U.S. 59, 68 (1995) (refusing to follow the rule interpreting omissions when result is so odd it defies "common sense" to impute that motive to Congress). Such is the case here. Rather than nullify Congress's decision, our interpretation gives effect to its choice over fifty years to create a multi-part scheme for transportation audits and bills. Given the oddities that would result from GSA's reading of the statute and the ways that reading would disrupt the integrated scheme, *see infra*, we find little meaning in any "omission" of the word "carrier" in § 3726(b). Nor does our interpretation create surplusage, because each reference to "transportation bills"—whether accompanied by a reference to carriers and freight forwarders—means the same thing.

Our read of § 3726 and the scope of subsection (b)'s audit authority is reinforced by the undisputed view of the relevant statutory and amendment history. Legislators, regulators, and industry have long understood the "obvious fact that the Interstate Commerce Act codified the common-law obligations of railroads as common carriers." *Am. Trucking Ass'ns v. Atchison, Topeka, & Santa Fe Ry. Co.*, 387 U.S. 397, 406 (1967). The "historic purpose of the [ICA]" was "to achieve uniformity in freight transportation charges, and thereby to eliminate the discrimination and favoritism that had plagued the railroad industry in the late 19th century." *S. Pac. Transp. Co. v. Com. Metals Co.*, 456 U.S. 336, 344 (1982). On its own terms, the ICA addresses only carriers. Ch. 104, 24 Stat. at

379–87. And when speaking of the ICA's reach and purpose, courts refer to those involved in the freight transportation industry—namely, carriers, freight forwarders, brokers, and shippers. *See, e.g.*, *Am. Broad. Cos. v. FCC*, 643 F.2d 818, 823 (D.C. Cir. 1980) ("[T]he Interstate Commerce Act seeks to achieve its central purpose of preventing unjust discrimination by requiring that all carriers file with the Commission the terms and conditions on which their services are available."); *United States v. Louisiana*, 290 U.S 70, 75 (1933) (noting "broad purpose" to "maintain an efficient transportation system by enabling the carriers to earn a fair return"). Congress did not disturb that view when amending the ICA in the Motor Carrier Act or the Transportation Act. And GSA has offered no evidence that Congress used the 1998 Amendment—which otherwise targeted the use of credit cards by government officials—to upend this longstanding statutory and regulatory backdrop.

Instead, that amendment preserved the core mechanics of the transportation bill scheme. Congress left subsections (b), (c), (d), (e), (f) and (g) largely unchanged and recodified them as subsections (d), (e), (f), (g), (h), and (i), respectively. So too with the time limitations to file a claim, which appeared pre-amendment in § 3726(a) and were moved to § 3726(c)(2). Aside from creating the § 3726(b) GSA audit authority, the 105th Congress made only three other substantive changes in the 1998 Amendment: mandating prepayment audits of carriers and freight forwarders, subject to GSA's exemptions and oversight, 31 U.S.C. § 3726(a)(1)–(a)(4); requiring GSA to adjudicate claims that cannot be resolved by the agency or the carrier or freight forwarder with the bill, *id.* § 3726(c)(1); and permitting GSA to give agencies audit and technical assistance on a reimbursable basis, *id.* § 3726(j). These drafting choices speak plainly to Congress's intent. It maintained that transportation bill audits would be funded by

overpayments collected from carriers. It limited GSA's new adjudicative authority to claims involving carriers and freight forwarders. And it kept intact the structure and effect of § 3726 as whole. Rather than a wholesale departure from the tradition of government audits of bills presented by carriers and freight forwarders, the 1998 Amendment reflects the opposite.

Concluding otherwise, as GSA asks us to do, would create several oddities in the statute's operation that otherwise do not exist. Even though GSA, on its interpretation, would have wide-ranging power to audit all transportation-related bills of any non-carrier before or after payment, no agency would be forced to conduct prepayment audits of a non-carrier's bills because § 3726(a) applies only to carriers and freight forwarders. And notwithstanding GSA's vast new authority, it would lack authority to adjudicate claims related to a non-carrier's bills under § 3726(c)(1), and the government could not rely on § 3726(d) to deduct money from future bills owed non-carriers to compensate for overcharges. The oddities continue in subsection (i): whereas carriers subjected to GSA audits may request review of the GSA Administrator's actions, non-carriers would have no such recourse. We decline to read § 3726(b) in a way that both disrupts a carefully drafted integrated scheme and produces anomalies not contemplated by Congress. *Cf. Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 7–13 (D.C. Cir. 2011) (rejecting interpretation that creates "odd" or "anomalous result[s]" in statutory scheme); *Georgetown Univ. Hosp. v. Sullivan*, 934 F.2d 1280, 1283 (D.C. Cir. 1991) (rejecting "interpretation [that] creates an odd result not contemplated by Congress").

Stated differently, GSA admits that before Congress's 1998 Amendment, the agency lacked authority to audit as it seeks to do now. Appellee's Br. 21. Per GSA, the 1998 Amendment was Congress's attempt to vastly expand GSA's

audit authority to cover an entirely new category of bills. But at the same time, Congress left the rest of § 3726 unchanged, at least as it concerns the scheme's operation over non-carriers. It would escape rationality to read § 3726(b) as creating a sweeping audit power over all transportation bills of any type presented by any person or entity—all while believing that Congress prohibited GSA from deducting overcharges from non-carriers and adjudicating disputes about NOCs.

The government tries to account for the odd results of its position. On the mismatch between permissible audits in § 3726(b) and the adjudicative scheme in § 3726(c), GSA concedes such a disconnect would result, but nevertheless insists it would be "common" for audit power not to be coextensive with adjudication authority. Appellee's Br. 22. Yet the government provides no similar statute to support its claim. Meanwhile, the District Court suggested that the comma after "transportation services" in § 3726(c)(1) creates a "disjunctive," which means GSA can resolve any claim "aris[ing] from the agency's procurement of 'transportation services'"—not just claims from carriers and freight forwarders. *Crowley*, 2023 WL 4846719, at *22 n.21. But that reading defies reason. On the District Court's logic, for bills involving carriers, both the agency and the carrier would have an opportunity to resolve the dispute before GSA must intervene and adjudicate the claim, yet for non-carriers, only the agency could resolve a claim, not the non-carrier submitting the bill. We decline to give the comma in § 3726(c)(1) that effect absent any evidence Congress sought to create such incongruity in the statute.

Similarly, on the deduction power in § 3726(d), GSA insists that there is no gap between what audits it is empowered to conduct and which bills are ripe for deductions. In GSA's view, notwithstanding the fact that § 3726(d) permits

deductions only from a carrier's bills, Congress actually created a new "source[] of funding" from non-carriers' bills in subsection (e) by referencing "similar type refunds" alongside "overpayments collected from carriers" as a means to finance transportation audits. Appellee's Br. 22–23. That argument does not withstand scrutiny. GSA would have us reason that Congress authorized broad new power to conduct audits of non-carriers, and then authorized deductions related to those non-carriers through a general phrase in a provision that itself does not address deductions. Section 3726(d)'s specificity about how deductions are calculated, with its reference to specific tariffs and rates only applicable to carriers, shows that Congress in § 3726(e) was not generating a new funding source for deductions on non-carriers' bills.

## C.

Because the text, statutory context, and statutory history make clear that § 3726(b) covers only those bills presented to the government by carriers and freight forwarders, we need not rely on the 1998 Amendment's legislative history. *Noble*, 103 F.4th at 50; *United States v. Burwell*, 122 F.4th 984, 991 (D.C. Cir. 2024); *see also United States v. Hansen*, 599 U.S. 762, 775 (2023) ("Statutory history is an important part of [a statute's] context."). We only note that GSA's arguments about the legislative history are misplaced. GSA contends that the 1998 Amendment "aimed to reduce 'Federal agency transportation expenses,'" Appellee's Br. 17 (quoting 112 Stat. at 2350), and the Senate Report "identified audits as a 'cost-effective tool' for achieving that goal," Appellee's Br. 17 (quoting S. REP. NO. 105-295, at 3 (1998) [hereinafter 1998 Senate Report]). But that passage does not make the point that GSA advances; instead, the report highlights how "cost effective" *pre*payment audits were compared to postpayment ones, which barely broke even. 1998 Senate Report, at 3. This difference accounts for

Congress's creation of mandatory prepayment audits. *See* 31 U.S.C. § 3726(a)(1). Put differently, the change that Congress thought would save "$50 million per year in reduced transportation expenses" was a switch from post- to prepayment audits of carriers and freight forwarders, 1998 Senate Report at 3, 6, not new and expansive power for GSA to audit non-carriers.

If anything, the history supports limiting § 3726(b)'s reach as we do today. For one, the bulk of the 1998 Amendment "require[d] [Federal] employees to use Federal travel charge cards" for payments relating to official travel and otherwise altered travel programs for government workers. 1998 Senate Report at 1; *see also* §§ 2, 4–7, 112 Stat. at 2350–52, 2354–57. Congress therefore was not focused on fundamentally altering the scope of § 3726—which for decades reached only carriers and freight forwarders—via the new § 3726(b) reference to GSA audit authority. Legislators are not presumed to "alter the fundamental details of a regulatory scheme in vague terms" or "one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

And, the Senate Report envisions a *reduced* role for GSA in the transportation auditing scheme. Congress anticipated more agency audits and fewer done by GSA. The Congressional Budget Office ("CBO") score of the 1998 Amendment's costs confirms this: "H.R. 930 would also increase direct spending by reducing the amount of overcharges that GSA recovers by auditing payments under current law." 1998 Senate Report, at 11. "GSA's recoveries would decrease because agencies would prevent many of the billing errors now detected by GSA." *Id.* Further, the CBO expected that "GSA would reduce the size and scope of its staff responsible for overseeing the audit contracts" after the 1998 Amendment. *Id.* The CBO score does not dictate our

interpretation of § 3726(b) because the statute's text, context, and history are clear. But the legislative history confirms our reading of the statute.

Accordingly, we hold that under § 3726(b), GSA may only audit bills presented by carriers and freight forwarders.

**IV.**

Because GSA is limited to auditing transportation bills presented by carriers and freight forwarders, we turn to the question of whether Crowley falls into that category. The District Court did not resolve the issue below. Rather than remand for the District Court to decide it in the first instance, we do so here.[9]

---

[9] This Court has latitude to address issues before us, even those not "passed upon below." *Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 919 (D.C. Cir. 2018) (internal quotation marks omitted). We are well-suited to answer the carrier question because GSA addressed the issue in its brief and Crowley did so in its reply. *See id.* (quoting *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 686 (D.C. Cir. 2010)). Neither party requested remand for resolution of the issue if it became ripe. Indeed, Crowley asserted without contradiction that there are no disputed facts on the question and both parties requested that we decide the issue in the first instance if we need to reach it. *See* Appellant's Br. 41; Appellee's Br. 24; Oral Arg. Tr. 29:12–20. Plus, with the DFTS contract and supporting documentation in the record on appeal, there are no additional facts that are unavailable to us but that the District Court would need to consider on remand. *See Liff*, 881 F.3d at 919. And, critically, resolving the carrier question here "avoids unnecessary expenditure of judicial resources and expedites final resolution of [a] dispute," *id.*, that already has come before our Court once before, *Crowley I*, 38 F.4th 1099.

We first must determine the governing test, as our Circuit has not yet articulated one. Three statutory provisions are relevant to this inquiry: First, a "motor carrier" is a "person providing motor vehicle *transportation* for compensation." 49 U.S.C. § 13102(14) (emphasis added). Second, a "broker" is a "person, other than a motor carrier [or that carrier's employee or agent], that . . . offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise selling, providing, or arranging for, transportation by motor carrier for compensation." *Id.* § 13102(2). Third, "transportation" includes "services related to [the] movement . . . of passengers and property," including "arranging for" such movement. *Id.* § 13102(23)(B).

We hold that, to be a carrier, one must physically transport freight or be contractually bound to help perform the movement of goods or passengers. Applying that test, Crowley does neither, so it is not a carrier and § 3726(b) does not allow GSA to audit bills Crowley invoiced under this contract.

## A.

While our decision about the governing test makes new law for our Circuit, we fortunately do not write on a blank slate. Congress and the Executive Branch have done much of the work for us. When interpreting 49 U.S.C. § 13102's definitions of carrier and broker, we have the benefit of the ICC's and the Department of Transportation's ("DOT") longstanding and unequivocal grasp of what those terms mean. *Cf. Food & Drug Admin. v. Brown & Williamson, Tobacco Corp.*, 529 U.S. 120, 156 (2000) (finding Congress legislating against backdrop of consistent agency regulation "effectively ratified the FDA's previous position"). Our respect for the ICC and DOT's understanding of brokers and carriers is "especially warranted" because the "Executive Branch interpretation was

issued roughly contemporaneously with enactment of the statute and remained consistent over time"—for more than 70 years. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024).

The DOT's distinction between carriers and brokers, 49 C.F.R. § 371.2 (2024), comes to us largely unchanged from two seminal reports published by the ICC in 1949 and 1951. From 1887 until 1996, the ICC first regulated rail carriers, then motor carriers and brokers, and, eventually, water carriers. *See United States v. Penn. R.R. Co.*, 323 U.S. 612, 616–19 & n.5 (1945); *N.Y. Foreign Freight Forwarders & Brokers Ass'n v. ICC*, 589 F.2d 696, 700 (D.C. Cir. 1978); *see also supra* Section I.A. After Congress passed the ICC Termination Act of 1995 and abolished the ICC, it transferred that authority to DOT. Pub. L. 104-88, 109 Stat. 803, 804, 856–57. The Department kept intact "all regulations in [the old title 49, Code of Federal Regulations] chapter X [as] previously issued by the ICC." Motor Carrier Transportation and Redesignation of Regulations Pursuant to the ICC Termination Act, 61 Fed. Reg. 54706 (Oct. 21, 1996) (codified at 49 C.F.R. Chs. III and X).

The source of the current regulation explicitly adopts the substantive "legal meanings" and "definitions" that were "previously discussed" in the ICC's 1949 and 1951 reports. 45 Fed. Reg. 31140 (May 12, 1980) (codified at 49 C.F.R. § 1045) (citing ICC, PRACTICES OF PROPERTY BROKERS, EX PARTE NO. MC-39, at 288–303 (1949) [hereinafter 1949 REPORT]; then citing ICC, PRACTICES OF PROPERTY BROKERS, EX PARTE NO. MC-39, at 633–47 (1951) [hereinafter 1951 REPORT]).[10]

---

[10] The "source" for DOT regulation 49 C.F.R. § 371.2(a) is 45 Fed. Reg. 68942 (Oct. 17, 1980). *See* 49 C.F.R. § 371 (1997). That final rule was "identical to those proposed" at 45 Fed. Reg. 31140 (May

In those publications, the ICC referred to carriers as those physically moving goods and to brokers as intermediaries facilitating transport by choosing carriers to do the job. Take the ICC's description of how the brokerage industry materialized "long prior to the adoption of the Motor Carrier Act of 1935": Brokers were "independent of both carriers and shippers," and "devoted to the solicitation of traffic *to be moved by [the] carriers*" they selected. 1949 REPORT, at 278 (emphasis added) (citation omitted). They worked "not only to the convenience of carriers," who often were small operators without sophisticated businesses, but also to help shippers, who were not "readily" able to "locate available motor carrier service when desired." *Id.* (citation omitted). Thus, the ICC's Coordinator of Transportation, in his second annual report, described brokers as "intermediaries between . . . shippers and motor carriers" that "in general, are not themselves engaged in transportation." *Id.* at 279 (citation omitted). Likewise, the Commission found that "a broker [was] essentially a middleman or intermediary." *Id.* at 298 (citation omitted). The broker, "[a]fter booking the shipment," would "arrange for a carrier, if none is readily on hand, to transport the shipment." *Id.* at 311. Freight brokers therefore "employ[ed]" carriers that "operate[d] over both regular and irregular routes." *Id.* at 281. And as the ICC recognized when it amended the broker definition in 1951, motor carriers only became brokers when they surrendered shipments "which they, themselves, are *not*

---

12, 1980), "except for minor corrections." 45 Fed. Reg. 68941 (Oct. 17, 1980) (codified at 49 C.F.R. § 1045). The proposed rule, in turn—including its definitions that would be codified in ICC regulations and imported in DOT's rule at 49 C.F.R. § 371.2(a)— explicitly intended to "not . . . make any changes in the legal meanings of the definitions" that were "previously discussed" in the ICC's 1949 and 1951 reports. 45 Fed. Reg. 31140 (May 12, 1980) (codified at 49 C.F.R. § 1045).

authorized to *perform*, in whole or in part." 1951 REPORT, at 646 (emphasis added).

The upshot is that both reports make clear that carriers perform or agree to perform the actual physical movement of freight. Brokers do neither. This understanding was incorporated into the ICC's regulations and those reissued by DOT, which defined brokers as those who "arrange[] or offer[] to arrange[] the *transportation* of property *by* an authorized *motor carrier*." 49 C.F.R. § 371.2 (emphasis added). As a textual matter, the regulation acknowledges that carriers are the party doing the physical movement of property.

The etymology of DOT's regulation is confirmed by the ICC's recognition, nearly contemporaneously with the 1935 Motor Carrier Act, that carriers alone physically transport goods. In applying Congress's definitions of carriers and brokers, the Commission found that applicants for carriage licenses who do not complete the transportation themselves cannot be carriers under the ICA:

> Applicant owns no motor vehicles, nor does it[] operate or control the operation of any such vehicles. It invariably employs the services of independent motor, rail, or water carriers to perform the transportation. Applicant's undertaking is not to transport, as in the case of a carrier, but is to see to it that goods are transported, using for this purpose the services of established carriers.

*Merchs. Carloading Co., Inc., Broker Application*, 22 I.C.C. 496, 496–98 (1940). Accordingly, a party that "bind[s] [itself] by contract to perform the transportation" is a carrier rather

than a broker, "even if the shipments are later in fact turned over [by that party] to other carriers." 1951 REPORT at 644.

Congress amended the ICA multiple times against this regulatory backdrop. Legislators never disapproved of the agency's distinctions between, or regulation of, carriers and brokers; instead, when Congress dissolved the ICC, it gave DOT authority (which the agency exercised) to reimplement the same carrier and broker definitions we see today. *See* ICC Termination Act § 204; *cf. Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996) ("[T]he Termination Act provides that '[a]ll orders . . . that have been issued . . . by the [ICC] . . . *in the performance of any function that is transferred by this Act* . . . shall continue in effect according to their terms.'" (alteration in *Burlington*) (quoting ICC Termination Act § 204(a))). We view "carrier" and "broker" as used by Congress, over more than a century and against consistent regulatory application, to be terms of art in the transportation industry, meaning Congress "kn[ew] and adopt[ed] the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *United States v. Alford*, 89 F.4th 943, 949 (D.C. Cir. 2024) (quoting *FAA v. Cooper*, 566 U.S. 284, 292 (2012)).

GSA asks us to upend decades of regulatory practice defining what it means to be a carrier via its proposed expansive interpretation of a phrase in the definition of "transportation." *See* 49 U.S.C. § 13102(23). Congress's acquiescence, however, in the Executive Branch's understanding of carriers and brokers governs our interpretation of 49 U.S.C. § 13102. Recall that motor carriers "provid[e] motor vehicle *transportation* for compensation," 49 U.S.C. § 13102(14) (emphasis added), and transportation covers the following services "related to" the "movement of passengers or property," *id.* § 13102(23)(A): "arranging for,

receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property," *id.* at § 13102(23)(B). Legislators determined which "services" to include in the definition of "transportation" while simultaneously preserving the longstanding belief that a carrier is the party that physically moves goods or passengers, or is contracted to help do so. At the same time, Congress expressed its preference that the term "carrier" not engulf "broker." 49 U.S.C. § 13102(2) (defining broker in part as person "other than a motor carrier").

We therefore decline to adopt as broad an interpretation of "arranging for" transportation as the government would like. We need not prescribe an exhaustive list of what services qualify as "arranging for" transportation within the meaning of 49 U.S.C. § 13102(23)(B). We do, however, hold that— whatever services are at issue—an entity can be a carrier only if it physically transports freight or is contracted to help do so. Our conclusion is consistent with the long-held regulatory view that for "services[] to constitute transportation within the meaning of the [ICA]," they "must be rendered in conjunction with a line-haul movement by the carrier who performs the line-haul movement or its agent." 1951 REPORT, at 645.

## B.

GSA seeks support for its interpretation from the Eleventh Circuit's "legal liability" framework in *Essex Insurance Co. v. Barrett Moving & Storage*, 885 F.3d 1292 (11th Cir. 2018). But GSA misreads the case.

In *Essex*, the Eleventh Circuit looked to the same DOT regulation discussed above, 49 C.F.R. § 371.2(a), and homed in on the final sentence's reference to motor carriers "*legally bound . . . to transport*" freight. *Id.* at 1300 (emphasis in

*Essex*) (quoting 49 C.F.R. § 371.2(a)). Reviewing a Carmack Amendment claim, 49 U.S.C. § 14706 *et seq.*, which concerns when motor carriers are "strictly liable to shippers" for "loss of goods damaged in transit," the Eleventh Circuit referenced the DOT regulation and held that a party was a carrier, and "not a broker[,] . . . if it has agreed with the shipper to accept legal responsibility for that shipment." *Essex*, 885 F.3d at 1296, 1301. In that Court's view, a genuine factual dispute existed as to whether a carrier ("Barrett")—one who was authorized to complete a shipment and had accepted and legally bound itself to do so—retained its carrier status, rather than becoming a broker, even for part of the shipment that it hired another carrier ("Landstar") to handle. *Id.* at 1295–96.

The government misreads *Essex*, in part because that case presented a question that does not appear here. When goods transported by Landstar were damaged en route, the property owner and its insurer sued Barrett to recover the loss. *Id.* Both the DOT regulation and the Carmack Amendment indicate that Barrett could not escape liability for damage to the cargo merely by claiming it was a broker as to the portion of the shipment completed by Landstar. *Id.* at 1299–1301. Consistent with our discussion above, *see supra* Section IV.A, the *Essex* court concluded that even if Barrett had hired Landstar to perform the transportation that damaged the cargo, Barrett nonetheless could be a carrier rather than a broker if it had "accepted *legal* responsibility to transport the shipment." *Id.* at 1301 (emphasis in original).

The regulation, 49 C.F.R. § 371.2, boils down to simple logic. If a party is a motor carrier, then it is not a broker under the ICA when it arranges transportation that it accepted and legally bound itself to complete. And the Carmack Amendment "makes all motor carriers 'who receive[], deliver[], or provide[] transportation or service' during a

shipment strictly liable to the shipper 'for the actual loss or injury to the property,' regardless of which carrier had possession of the shipment at the time it was lost or damaged." *Essex*, 885 F.3d at 1298 (alteration in *Essex*) (quoting 49 U.S.C. § 14706(a)(1)). "Carmack's purpose is to relieve cargo owners 'of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods.'" *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 98 (2010) (quoting *Reider v. Thompson*, 339 U.S. 113, 119 (1950)); *see also Se. Freight Lines*, 63 Comp. Gen. 1, 243–45 (1984) ("[T]he [ICA] permits a claim for damage to be filed against either the originating or delivering carrier, and either is liable for the full loss irrespective of who may have possession of the goods when damaged.").

GSA argues that because Crowley agreed to be liable for any damage to property transported under the contract, *Essex* supports the conclusion that Crowley is a carrier. Appellee's Br. 25–27; Oral Arg. Tr. 27–29. In GSA's view, if carriers are strictly liable for all damage under the Carmack Amendment, then Crowley's acceptance of liability for damage makes it a carrier.

But that is not what *Essex* says, nor is it consistent with the Carmack Amendment. Just because the Carmack Amendment says that a carrier is strictly liable for any damage to the shipment, the statute cannot be turned backwards to mean that any party that agrees to accept liability for damage to a shipment is a carrier. GSA's argument is akin to saying that because all squirrels eat nuts, anything that eats nuts must be a squirrel. The Carmack Amendment's imposition of strict liability upon carriers simply does not answer the antecedent question of whether a party is a carrier in the first instance. Further, GSA's contention that Crowley's acceptance of

responsibility for damage to shipments makes it a carrier under *Essex*'s "legal responsibility" test is unpersuasive. As described above, *Essex* concluded that a carrier was a party that "accepted legal responsibility *to transport the shipment*," 885 F.3d at 1301 (emphasis altered), rather than a party that accepted legal responsibility for any damage to the shipment. *Essex* nowhere endorsed the reverse engineering of the Carmack Amendment that GSA attempts here.

Established regulatory distinctions between carriers and brokers—which were incorporated into the provision cited in *Essex*—confirm this understanding. Aside from Carmack's assignment of responsibility, the ICC referred to legal liability to address a specific problem that occurred frequently in the developing carriage industry: whether carrier or broker *registration* was required for a motor carrier who turned over freight to another motor carrier in order to complete a shipment that the first carrier agreed to transport. *See, e.g.*, 1951 REPORT, at 636–37. This "more or less universal" practice among carriers persisted for several reasons. 1949 REPORT, at 290. Some carriers lacked equipment necessary to finish a shipment, whereas some maximized profits by utilizing another carrier to complete economically inefficient routes. *Id.*; 1951 REPORT, at 637. Still others helped competing carriers in exchange for assistance with future cargo. 1949 REPORT, at 290. In 1949, the Commission determined that motor carriers must register as brokers when they turn over freight in this manner. *Id.* at 290. Just two years later, though, the Commission reversed course and sided with carriers who argued that they did not become brokers solely because they relied on other carriers to complete shipments. 1951 REPORT, at 647. When it adopted this new framework, the ICC excluded from broker registration requirements any carrier both authorized to complete a shipment and "legally bound . . . by

contract to transport" the freight, even when it relied on other carriers to do so. *Id.*

This issue in the carriage industry and the resulting distinction between carriers and brokers confirms our reading of *Essex* and further supports rejecting GSA's blinkered approach. The ICC regulations' reference to legal liability, 1951 REPORT, at 638, 647, mirrors the usage of that concept in the Carmack Amendment context—and both are reflected in DOT's current iteration of 49 C.F.R. § 371.2(a). Legal liability did not distinguish between carriers and brokers, as GSA suggests, but instead gave carriers the freedom to subcontract other carriers for all or part of a shipment without necessitating a separate brokerage license. If a motor carrier elected to do so, however, it could not later disclaim liability for damage that occurred when the subcontractor had possession of the freight. GSA's reliance on *Essex* is misplaced because none of this establishes that an entity's acceptance of legal liability makes it *ipso facto* a motor carrier. In other words, any assumption by Crowley of liability for damage to USTRANSCOM's cargo might be a beneficial arrangement for the government, but it does not make Crowley a carrier.

## C.

A complete read of the parties' contractual obligations and their positions in litigation demonstrate that Crowley is not a carrier because the company does not physically transport freight for USTRANSCOM, nor is it contractually bound to help do so.

Start with the contract, which is replete with references to Crowley's role as an intermediary. The contract's standard process makes clear that Crowley receives a request and engages third-party carriers to complete the movement of

freight. *See supra* Section I.B; J.A. 147–49. And the "Process Overview" section describes "the general process flow of a *typical* shipment and the accompanying responsibility of each party to the contract," J.A. 126–27 (emphasis added): The Department of Defense determines the requirements for a particular shipment and sends a request to Crowley, after which Crowley draws upon "its expertise, tools, and best commercial business practices" to pick a third-party carrier and a mode of transportation that minimizes costs to the government and meets delivery expectations. J.A. 127. Elsewhere, Crowley is tasked with "provid[ing] oversight and management of transportation tasks in [the Performance Work Statement ("PWS")]." J.A. 96–97. That PWS in turn provides that the "*contractor's carrier* shall pick up and deliver the shipment as directed by the contractor." J.A. 127 (emphasis added). Nowhere in the agreement's "typical" process does it suggest Crowley itself undertakes physical movement of any freight.

Instead, the "typical" arrangement corresponds to the PWS's "[s]cope": that Crowley provides "transportation *coordination* services . . . to support the United States Government," the "Department of Defense," and "DoD contractors." J.A. 94. Among these transportation coordination services are "[a]rranging, coordinating, monitoring, and controlling freight shipments from receipt of shipment request through final delivery"; "[a]rrang[ing] transportation services to meet Mandatory Delivery Date"; "[p]erforming shipment routing services as applicable according to Defense Table of Distances"; "[p]erforming subcontractor pre-payment audits, processing and making payments to sub-[c]ontractors and transportation providers for services provided"; "[a]ccepting, processing, and facilitating the resolution of claims resulting from loss or damage"; and "[s]electing and managing carriers, carrier quality and performance." J.A. 104–06.

Finally, consider the various contractual provisions that differentiate between Crowley's job and the responsibilities of its carriers. Crowley's "Carrier Management" responsibility covers "all facets of carrier management, from carrier selection through final payment"—including the duty to "select transportation providers (motor carriers, rail carriers, air carriers) to transport [Department] cargo and ensure such carriers meet [regulatory standards]." J.A. 106. Accordingly, Crowley must "establish, maintain, and manage all necessary subcontracts with carriers to move freight under this contract." *Id.* Crowley also manages "administrative, clerical, documentation, billing, carrier payment audit, and related functions that provide general support for the program." J.A. 97. And Crowley assumes responsibility for amassing specific types of data and conducting certain types of analytics to evaluate performance—including, "provid[ing] a scorecard indicating [Crowley's] success in making timely freight payments to carriers." J.A. 101.

Carriers, on the other hand, are the only ones referenced in the contract's section on "Shipment Delivery"—that is, the actual freight movement—which provides that "[t]he contractor's carrier shall make on-time delivery of the shipment." J.A. 133. When it comes to physically moving freight, Crowley, for example, "coordinate[s] the arrival of loaded trailers to be unloaded at a later time" when requested "by a shipper or carrier." J.A. 134. Or, Crowley can use "intermodal transportation" (one shipment completed by multiple modes) and it can "shift" the "mode," to "meet pickup and delivery constraints," but any time there is resulting "*change to [a] carrier assignment*," Crowley must give advance notice. J.A. 115 (emphasis added).

The contract thus contemplates Crowley as an intermediary, not a carrier. In resolving the question, though,

we are aided not only by the contract, but also by the positions both parties have adopted in this litigation. In its Answer to Crowley's Complaint, GSA admitted, J.A. 277, several critical facts: that Crowley "coordinates services between various locations," *cf.* J.A. 19–20 (Compl. ¶ 30); that "Crowley subcontracts the movements to third parties and handles all facets of carrier management, from selection through final payment, including selecting transportation providers (motor carriers, rail carriers, air carriers) to transport [Department] cargo," *cf.* J.A. 20 (Compl. ¶ 32); and that the typical process outlined above for the shipping process results in Crowley "coordinate[ing] transportation services," *cf.* J.A. 20 (Compl. ¶¶ 34–35). The only thing GSA denied in its Answer was the bottom-line conclusion that Crowley is a carrier, J.A. 277 (Answer ¶ 31), which is unsurprising because doing so would be fatal to its audit authority over Crowley under our interpretation of § 3726(b). But that insistence from GSA, like its arguments on appeal, cannot alter the contract's terms or undermine USTRANSCOM's decision to hire an intermediary that would, in turn, "arrang[e] for[] transportation *by motor carrier* for compensation." 49 U.S.C. § 13102(2) (definition of "broker").

At oral argument, GSA homed in on the contract's "liability standard." There, the agreement states that "[w]hether [Crowley] functions as a transportation provider itself or enters into a contractual or other arrangement with a transportation provider," Crowley is "liable to the Government for the property transported under th[e] contract while the property is in the possession of the transportation provider." J.A. 107. In GSA's view, this clause is dispositive of Crowley's status as a carrier. Oral Arg. Tr. 27:18–28:5.

While the provisions GSA references underscore Crowley's role in guaranteeing the successful shipment of

goods for USTRANSCOM, they do not show that Crowley itself moves any freight or is contractually bound to help do so. It therefore is of no moment that Crowley bears full "responsib[ility] for all facets of carrier management," J.A. 106, or that Crowley ensures that its carriers arrive timely and have proper equipment, J.A. 104, 112, 116–17, 130, 147. What matters is that the contract envisions the physical movement of freight to be performed by the carriers Crowley hires, not by Crowley.

Crowley therefore is not a carrier within the meaning of 31 U.S.C. § 3726. GSA cannot leverage its § 3726(b) authority to audit bills that Crowley submits to USTRANSCOM. The District Court erred by failing to permanently enjoin GSA from conducting postpayment audits of those bills.

## V.

For these reasons, we reverse the District Court's holding that 31 U.S.C. § 3726(b) permits GSA to audit non-carriers, and we remand for proceedings consistent with this opinion.

*So ordered.*

RANDOLPH, *Senior Circuit Judge*, dissenting:

This case is moot. The majority opinion undertakes to resolve a dispute about a contract that is no longer in effect. Doing so violates Article III of the Constitution, intrudes on the exclusive jurisdiction of the Court of Federal Claims and the Court of Appeals for the Federal Circuit, and disregards the restrictions on judicial review in the Administrative Procedure Act.

**I.**

Crowley brought this action in August 2021, seeking an injunction and a declaratory judgment to prevent the General Services Administration from conducting audits of its invoices issued during the DFTS I contract. Several months earlier, Crowley filed an action in the Court of Federal Claims pursuant to the Tucker Act[1] alleging breach of contract and seeking $11.8 million in damages resulting from past GSA audits under the same DFTS I contract.[2]

The DFTS I contract expired in December 2024.[3] To state the obvious, Crowley is no longer performing any services under that contract and GSA is not auditing any of its DFTS I invoices. The expiration of the DFTS I contract while this appeal was pending ended the only controversy over which the district court

---

[1] The Tucker Act confers exclusive jurisdiction on the Claims Court "to render judgment . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).

[2] *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022) (*Crowley I*).

[3] Even before the contract expired, and in the wake of settlement discussions, GSA agreed to stop and did stop auditing Crowley's invoices.

(and thus this court) had jurisdiction—namely, whether Crowley was entitled to an injunction preventing GSA from auditing Crowley's DFTS I invoices.

The majority nevertheless declares that the case is not moot. It is not moot because if our court issues a judgment favorable to Crowley, this would assist Crowley in its Claims Court damages action claiming that GSA exceeded its authority. Majority Op. at 11. The majority puts it another way: "although [the $11.8 million] is not the subject of this case . . . our decision may (although it certainly may not) prove useful to Crowley in its quest for damages in the Court of Federal Claims." *Id.* at 12-13.

That rationale contradicts a constitutional principle "established as early as 1793," a principle that "has been adhered to without deviation." *Flast v. Cohen*, 392 U.S. 83, 96 (1968). The principle is that no federal court may render an advisory opinion. Yet that is precisely what the majority is doing—overtly, no less. They are issuing an opinion to provide advice to the Claims Court about a damages action over which our court has no jurisdiction. *See* note 1 *supra*.[4]

The parties in the case before us—Crowley and GSA—are also parties in Crowley's Claims Court damages action. This raises still another problem with the majority's rationale—it contradicts *Christopher Village, L.P. v. United States*, 360 F.3d 1319 (Fed. Cir. 2004).

---

[4] At several points my colleagues state that the Claims Court may either take their advice or leave it. Majority Op. at 14, 16. Those statements further emphasize the advisory nature of their opinion. *See, e.g., Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) ("Without preclusive effect, a declaratory judgment is little more than an advisory opinion.").

3

The opening paragraph of the *Christopher Village* opinion deserves full quotation: "This case presents the question whether a federal district court has jurisdiction to issue a declaratory judgment as to the government's liability for breach of contract solely in order to create a predicate for suit to recover damages in the Court of Federal Claims. We hold that district courts do not have such jurisdiction because the Court of Federal Claims has exclusive jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (2000), to adjudicate breach of contract claims for money damages in excess of $10,000, and Congress has not waived sovereign immunity for such suits in district courts."[5]

The Claims Court, bound by *Christopher Village*, would therefore be compelled to treat the majority's decision here as "void," which is how the Federal Circuit treated a comparable judgment of the Fifth Circuit. *Id.* at 1333.

It does not matter that in *Christopher Village* the injunction suit in the district court was filed before the damages action in the Claims Court, whereas here, the damages suit was filed before the injunction action. The *Christopher Village* plaintiffs argued that their victory in the Fifth Circuit, issued before a decision in the Claims Court damages action involving the same parties, was *res judicata*. 360 F.3d at 1326. The Federal Circuit rejected that argument because the Fifth Circuit's decision was "void." *Id.* at 1332. What mattered in *Christopher Village*—and what matters here—is not which complaint was filed first. What mattered was that the mooted injunction action was decided before a decision in the damages action—a sequence that potentially gave rise to *res judicata*. That sequence is the same in all relevant respects as the sequence in

---

[5] As the Federal Circuit held, "the court of appeals jurisdiction is dependent on the district court's jurisdiction." 360 F.3d at 1326.

this case.

The majority tries to distinguish *Christopher Village* on the basis that the district court here had jurisdiction over the complaint when Crowley filed it. Majority Op. at 13. That is no distinction at all. As the Federal Circuit in *Christopher Village* recognized, the district court in that case also had jurisdiction when the complaint was filed. 360 F.3d at 1327.[6]

Another Federal Circuit precedent, relied upon in *Christopher Village*, further undercuts the majority. Section 704 of the Administrative Procedure Act, 5 U.S.C. § 704, which Crowley invoked in the district court, permits a claim for relief other than money damages only if "there is no other adequate remedy." *Id.* *Consolidated Edison Co. v. United States*, 247 F.3d 1378 (Fed. Cir. 2001), held that "a litigant's ability to sue the government for money damages in the Court of Federal Claims is an 'adequate remedy' that preclude[s] an APA waiver of sovereign immunity in other courts." *Christopher Village*, 360 F.3d at 1327 (quoting *Consolidated Edison*, 247 F.3d at 1384). At least four other circuits agree. *See id.* at 1328-29. That too dooms the majority's venture into the Claims Court's jurisdiction.

The majority makes one final, labored effort to distinguish *Christopher Village.* Majority Op. at 14-16. This one is even more contrived. Now the idea is that the Federal Circuit could not have meant that the Fifth Circuit lacked "jurisdiction." Instead, according to my colleagues, the Federal Circuit must

---

[6] "Thus, there is no question that the District Court for the Southern District of Texas properly had jurisdiction over the original [injunction] action . . . But, as the Fifth Circuit correctly held, . . . the request to enjoin" the government "became moot." *Christopher Village*, 360 F.3d at 1327.

5

have (should have?) meant that the Fifth Circuit's decision rested on APA § 704 and the lack of a waiver of sovereign immunity.[7]

On the (dubious) assumption that any of this even matters, the majority—to quote their opinion—is "flat wrong"[8] in assuming that sovereign immunity is not jurisdictional. A bit of legal research would have produced the Supreme Court's unanimous decision in *FDIC v. Meyer*, 510 U.S. 471, 475 (1994): "Sovereign immunity is jurisdictional in nature."[9]

To sum up, the majority finds itself in a trap of its own devising. If it intends its opinion to be *res judicata* in the Claims Court it runs headlong into *Christopher Village* and more.[10] If instead the majority intends that its decision not have

---

[7] The Federal Circuit's holding was this: "Under these circumstances we must conclude that the Fifth Circuit lacked jurisdiction over the action for a declaratory judgment because the APA did not waive the United States' sovereign immunity for such a suit in district courts." *Christopher Village*, 360 F.3d at 1329.

[8] Majority Op. at 13.

[9] There is some room for disagreement on this question, but it has no bearing on this case. *See Mowrer v. U.S. Dep't of Transportation*, 14 F.4th 723, 733 (D.C. Cir. 2021) ("sovereign-immunity . . . goes to our jurisdiction") (Katsas, J., concurring); *but see id.* at 744 n.2 (Randolph, J., concurring).

[10] Judge Posner accurately criticized the sort of faulty reasoning reflected in the majority's opinion: "it is circular to argue that a judgment is not moot because it may have preclusive effect, when it can have preclusive effect only if it is not moot. That determination must rest on more than the truism that a final judgment can collaterally estop parties (and sometimes nonparties) in future litigation." *CFTC*

any preclusive effect in the Claims Court, it is confessing that its opinion is advisory-only in violation of the Constitution.

## II.

Perhaps realizing the weakness of its justifications, the majority comes up with still another inadequate reason to explain why it is refusing to declare the case moot: that Crowley is challenging an "ongoing GSA policy." Majority Op. at 19. To understand why this reason is inadequate, some additional background information is needed.

As the expiration of the DFTS I contract approached, the United States Transportation Command issued requests for proposals on a new contract—DFTS II. Unlike DFTS I, the proposed DFTS II contract contained clauses stating that the contractor who is awarded the new contract will be subject to audits by GSA pursuant to the Transportation Act of 1940, 31 U.S.C. § 3726(b). Crowley protested these clauses, but the Government Accountability Office dismissed the protest because the issue Crowley raised was before our court. *Crowley Gov't Servs., Inc.*, B-421982, 2023 WL 9184936 (Comp. Gen. Dec. 19, 2023).

After GAO's dismissal, Crowley brought a separate action in the Claims Court, a pre-award bid protest objecting to the DFTS II auditing clauses. In May 2024, the Claims Court issued its opinion. *See Crowley Gov't. Servs., Inc. v. United States*, 171 Fed. Cl. 453 (2024). The court agreed with an argument made by Crowley: that—contrary to GAO's opinion—its protest regarding the DFTS II contract was not the same as the claim

---

*v. Board of Trade*, 701 F.2d 653, 656 (7th Cir. 1983) (Posner, J.), cited with approval in *Camreta v. Greene*, 563 U.S. 692, 712 (2011); *U.S. v. Juvenile Male*, 564 U.S. 932, 937 (2011).

then pending on appeal in our court. *Id.* at 462. The claim was not the same because GSA's auditing of the DFTS II contract would occur in accordance with contractual provisions.[11] The Claims Court then rejected Crowley's complaint on the ground that the government has the authority to set its own contract terms. *Id.* at 465-67.

Later that summer, the Transportation Command awarded Crowley the new $2.3 billion DFTS II contract. The contract took effect at the beginning of 2025 and runs through January 31, 2032. The DFTS II contract contains two clauses not contained in DFTS I. Clause 1.12.1.1. states: "The Contractor is deemed to be a carrier and/or freight forwarder for purposes of this contract." And Clause 1.12.19.1. states: "This contract is subject to GSA audits . . .."

These developments alone show beyond any doubt that the majority should have declared this case moot. That is so even if one generalizes the allegedly wrongful conduct in Crowley's district court complaint to be GSA's auditing of any Crowley contract not containing clauses authorizing GSA to do so. That describes the DFTS I contract. It does not describe the DFTS II contract now in effect.

More important, the validity of the DFTS II auditing clauses is now properly before the Federal Circuit. "Properly" because the issue concerns an "object[ion] to a solicitation by a Federal agency for bids or proposals for a proposed contract."

---

[11] On the other hand, Crowley's district court complaint alleged that GSA was acting without contractual authority because the DFTS I contract does not "state that the contract is subject to GSA's audit authority," Compl. ¶ 29, and because "[t]he contract does not identify GSA as having any role to play in the contract, much less authority to make decisions or participate in the dispute process," *id.* ¶ 41.

8

28 U.S.C. § 1491(b)(1). Under the Administrative Dispute Resolution Act, which amended the Tucker Act, the Claims Court, and thus the Federal Circuit, has exclusive jurisdiction over such cases. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1079 (Fed. Cir. 2001) ("it is clear that Congress's intent in enacting the ADRA . . . was to vest a single judicial tribunal with exclusive jurisdiction to review government contract protest actions."); *see also Labat-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 148 (D.D.C. 2004); *Novell, Inc. v. United States*, 109 F. Supp. 2d 22, 24-25 (D.D.C. 2000).

Despite all this, the majority states that the case is not moot because "Crowley challenges an ongoing GSA policy." Majority Op. at 19. As with its initial rationale for keeping the case alive, this newly-minted claim is frivolous.

First, what is meant by "an ongoing GSA policy"? Where exactly may we find this "policy"? Is it in some regulation issued after notice and comment? No. Is it in some guidance document? No. Perhaps in a press release? No. So where is this "ongoing policy" dealing with GSA audits of Crowley? The only such "policy" that is "ongoing" in this case is the DFTS II contract. But the Court of Federal Claims and the Federal Circuit have exclusive jurisdiction to determine the validity of the GSA audit provisions in that ongoing contract.

Furthermore, since when did federal courts become arbiters of "ongoing policies" of federal agencies? The Administrative Procedure Act provides the answer: never. "[A]n on-going program or policy is not, in itself, a 'final agency action' under the APA." *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990)); *see also, e.g., Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006); *Ctr. for Auto*

*Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807-08 (D.C. Cir. 2006). Federal jurisdiction depends on "final agency action." So where is the final agency action with respect to this ongoing GSA policy? The majority does not say. It does not say because the only relevant final agency actions in this administrative law case are GSA's audits of the DFTS I contract, which has expired, and the execution of the DFTS II contract, over which our court has no jurisdiction.

Perhaps the majority's thinking is that sometime in the future Crowley might enter into some other government contract and become subject to GSA audits.[12] If this is the thought, it evokes the standard mootness exception for issues "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911); *see also Christian Knights of the Ku Klux Klan v. District of Columbia,* 972 F.2d 365, 367, 370 (D.C. Cir. 1992). But there is no need to evaluate the "repetition" part here. The second half of the exception—the "evading review" requirement—clearly, certainly does not apply. Both of the DFTS contracts were for many years, during which judicial review could, did, and is taking place—in the Federal Circuit and in the Court of Federal Claims, where these cases now belong.

---

[12] Pursuant to 31 U.S.C. § 3726(g), on July 2, 2025, GSA delegated its authority to audit transportation bills to the "agency where the transportation invoice was paid." GSA, ADM 5450.39D CHGE 183, *Delegation of Authority* (Order) (July 2, 2025).